Pierre Valdez LEWIS, Appellant,

v.

UNITED STATES, Appellee.

No. 08–CF–968.

District of Columbia Court of Appeals.

Argued Oct. 14, 2010.

Decided Dec. 30, 2010.

Sloan S.J. Johnston, Public Defender Service, with whom James Klein and Samia Fam, Public Defender Service, were on the brief, for appellant.

Amanda J. Winchester, Assistant United States Attorney, with whom Ronald C. Machen Jr., United States Attorney, and Roy W. McLeese III, and Tom A. Gillice, Assistant United States Attorneys, were on the brief, for appellee.

Before WASHINGTON, Chief Judge, THOMPSON, Associate Judge, and NEBEKER, Senior Judge.

WASHINGTON, Chief Judge:

Pierre Lewis appeals from his convictions on three counts: arson, in violation of D.C.Code § 22–301 (2001); malicious destruction of property ("MDP"), in violation of D.C.Code § 22–303 (2001); and obstruction of justice, in violation of D.C.Code § 22–722(a)(2)(A) (2001).[1] He was sentenced to concurrent 48–month sentences on the arson and MDP counts, and 168 months, to be served consecutively, on the obstruction of justice count. On appeal, Lewis contends (1) that the trial court improperly curtailed his cross-examination of a key government witness and thereby violated his constitutional rights, and (2) that there was insufficient evidence that he possessed the *mens rea* required to convict him of arson. We hold that while there was no reversible error in the trial court's curtailment of cross-examination, the government did fail to present sufficient evidence of Lewis' *mens rea* to sustain his conviction for arson, and we, therefore, reverse his conviction on that count.

## I.

After a trial before Judge Herbert B. Dixon, Jr., a jury convicted Lewis of arson, MDP, and obstruction of justice based upon his involvement in a fire that occurred in a vacant house (the "House") on

---

1. Although Lewis was also charged with first-degree murder of the victim, the jury acquitted him of this charge and the lesser-included offense of second-degree murder.

September 22, 2004. When the fire was extinguished, investigators determined than an accelerant such as gasoline had been used to set the fire. Investigators also discovered the remains of Lesley Stewart in the House. Stewart had been stabbed multiple times, and it was conclusively established that he died of his stab wounds before the fire was set.

Evidence presented at trial indicated that Lewis and Stewart were both habitual drug abusers. Stewart did odd jobs (such as washing cars) for Charles Washington, a neighborhood drug dealer. According to Washington, Stewart had a similar relationship with another neighborhood drug dealer, Kim Holston. Washington testified that Stewart had told him that Holston had been cooperating with police and intended to send undercover officers to make a surreptitious purchase of drugs from Washington and thereafter arrest him. Washington confronted Holston about this allegation, and immediately thereafter Washington watched as Holston and Stewart had a conversation. After that conversation, Stewart told Washington that Holston had said something about Stewart's allegations of Holston's assistance to police. After Washington saw Holston looking for Stewart over the next few days, Washington told Stewart to lie low for a while. Stewart told Washington that he had found a new place to stay that no one knew of. This was the last time Washington ever saw Stewart.

Although there was no direct evidence placing Lewis at the scene of the fire, the government presented five witnesses who implicated Lewis in the stabbing of Stewart and subsequent burning of his body at the House. Washington testified that on the night of the fire, Lewis came to Washington's home and asked for a match or a lighter. Carol Russell testified that on an unspecified date around the time of the fire, she had been doing drugs at a house Lewis entered and that while she did not notice an odor before Lewis entered, the house smelled like gasoline once Lewis was there. Another drug user, Catherine Mitchell, testified that shortly before she learned of Stewart's death, Lewis told her that he had to "do a job" for someone and would soon be receiving two or three "eight-balls" of cocaine and up to $1,000 in return, and that he would likely have to leave town for a while. She also testified that Lewis then contacted Holston about acquiring free drugs.

Franklin James testified that while he and Lewis were doing drugs together at James' mother's house, Lewis said he had to "make something happen" and left the house, and then returned and said he had "stabbed somebody." According to James, later that night Lewis left the house with James' mother's gas can; when Lewis returned, he made a phone call to see if he could get some drugs for "a favor he did for [the unnamed call recipient] earlier." Lewis then got into a van that James associated with Holston and returned a few minutes later with cocaine that Lewis said "his man" had given him for "doing something." James testified that about a year later, when James and Lewis shared a jail cell, Lewis confessed to James that he had stabbed someone and set fire to the body to destroy traces of Lewis' own DNA that would be found under the victim's nails since the victim had "scratched" him.[2]

Another jailhouse informant, Daniel Harris, also testified that while he was

2. To support its obstruction of justice charge, the government also presented evidence of Lewis' attempts to persuade James to make false statements to investigators regarding Stewart's murder and the fire. Because these facts are not relevant to this appeal, we need not discuss them in detail here.

jailed with Lewis, Lewis told him that he was "locked up in North Carolina because he was on the run for a body in D.C." and that he had "stabbed a guy for some coke" and then fled. Lewis told Harris that because the victim had scratched him, he returned with a gas can, "wiped the place down and burned it up."

Every government witness was substantially impeached based upon either prior convictions or motives to curry favor with the government in order to receive reduced or more lenient sentencing of their own. The only cross-examination Lewis appeals is that of Charles Washington. On direct examination, Washington testified that his home had been raided and that he was convicted of various drug crimes, but that he had not received any "promise[s]," "deals," or "benefits" from the government in connection with that case. On cross-examination, Lewis sought to inquire as to Washington's state of mind when he discussed Lewis' case with the government. The trial court precluded Lewis' questions regarding Washington's potential sentence for his drug crime or his state of mind when talking to police investigators, but allowed Lewis to inquire as to various other circumstances of Washington's drug offense and subsequent cooperation with the government. Because a recitation of the precise questions asked, answered, and precluded is essential to our holding, we must here describe these portions of Washington's cross-examination thoroughly.

When Lewis' counsel began to cross-examine Washington about his drug charges, Washington acknowledged that he spoke to police about Lewis' case only after his own drug case arose. The witness testified that he had been arrested with "heroin" and "crack" in his house and

that he had been "locked up" on his own "drug distribution" charge. When defense counsel asked if Washington knew that his drug charges "could carry ... up to 60 years," the government objected and a bench conference ensued. The trial court said that before it would allow counsel to explore the drug penalties, "there's got to be a little more about whether or not there was a possibility of a deal. Right now, the evidence doesn't suggest there was a deal." Defense counsel responded, "I'm sorry. Let me be clear. There was not [a deal]. What I'm talking about is what was in the witness' mind.... He's talking to [police] in the hopes of getting something." The trial court nonetheless sustained the objection, saying this was "too speculative right now.... Once we get a little closer to there being some kind of a deal, then you'll be able to explore those kinds of things but not just based on the fact that you suspect that in his mind he was trying to get a deal at this point." Defense counsel again tried to explain her position that when Washington began discussing Lewis' case with police, "he was already locked up on drug distribution ... facing 60 years, and he was trying to work it off by giving information to [police] so he could get a lesser sentence.... So I'm talking about what's in his mind at the moment when he starts to speak to [police]...." [3] The trial court again maintained its position that defense counsel would have to "make a little more of a record ... for [it] to allow this type of inquiry" and sustained the objection.

Later on, defense counsel returned to Washington's drug conviction and was permitted, over objection, to ask Washington "how much heroin" was in his home when he was arrested; Washington testified that he did not know. Defense counsel then elicited that Washington pled guilty to

---

3. During the bench conference, defense counsel indicated that although Washington was

facing up to 60 years in prison, he ended up serving less than one year.

having the heroin in his home. He testified that after his arrest for that charge, he had his first meeting with "Detective Waylon," the detective in charge of Lewis' case who himself testified before the jury in Lewis' case. Over objection, defense counsel was permitted to ask Washington if he "[was] talking to [the detective] because [he] had been arrested in his own case," to which Washington replied "[n]o." When counsel then asked, "you know that talking to a homicide detective can reduce your sentence in your own drug case, correct," the prosecution objected. The trial court sustained, saying defense counsel had not "laid the foundation [it] insisted on."

Defense counsel tried again, asking "you know that it's beneficial to you to give information to police officers to work off your own case, correct?" Another objection and bench conference followed, during which defense counsel expressed that she did not know what more foundation the trial court was looking for. The trial court said that it did not "think the foundation is going to be there based on ... what the witness has said so far. I think you and I just disagree as to what the proper basis would be for me to allow you to go into that issue." Defense counsel replied, "is the court saying that there has to be a deal in order for me to get into the facts of whether or not this witness·thought that ... providing information in his arrest ... was going to benefit his own case?" The trial court responded that it "has to be more than mere speculation." Defense counsel stated that she had the grand jury testimony where Washington discussed other murder cases, which indicated that she was not speculating but instead that the "inference is that he knows if he gives information to [police] about things he claims to know they'll reduce his sentence." The prosecutor noted that the transcript of Washington's interview with

police begins by indicating that Washington was "not under arrest at the time and that nothing's been promised to him in exchange for talking with them about this and that he ... came willingly along with police that night." The trial court sustained the objection.

Defense counsel later tried this line of questioning a final time, eliciting from Washington that he had previously been convicted of multiple drug offenses including at least one felony. After first denying that he knew he might face jail time for his recent drug charges, Washington later admitted that he "had a feeling [he] would probably go to jail." Defense counsel then elicited that Washington knew that the same United States Attorney's Office that was prosecuting Lewis was also the one that handled Washington's own recent drug case. When defense counsel asked Washington if he knew that "the U.S. Attorney's Office can assist you in your case when you give them information on another case," the trial court sustained the government's objection, stating that it would "place the limit here." Thereafter, defense counsel finished cross-examining Washington and he was excused.

## II.

Although the trial court did err by curtailing defense counsel's cross-examination of Washington, we hold that the error neither rose to the level of constitutional error nor amounted to an abuse of discretion by the trial court. Therefore, we affirm his convictions for MDP and obstruction of justice, neither of which were otherwise challenged in this appeal.

### A. The Trial Court's Error

 The government concedes that the trial court erred "to some degree" by limiting Washington's cross-examination.

Defense counsel is entitled to cross-examine a government witness to show his bias based upon a motive to curry favor with the government "not only if [the government witness] had a relationship with the court, ... at the time of trial but also if he had such a relationship when the government was in touch with him during investigation of the crime." *Artis v. United States*, 505 A.2d 52, 54 n. 2 (D.C.1986) (citing *Tabron v. United States*, 444 A.2d 942, 943 (D.C.1982)). Such a witness "may make statements to an investigator ... in order to curry favor, and then be called to testify after the relationship is ended," but still be subject to the same bias motivation. *Artis, supra*, 505 A.2d at 54 n. 2 (citation omitted). It is not a prerequisite to cross-examination on a basis of a motive to curry favor for there to be a "deal" already in place; it is rather the witness' subjective belief of the potentially beneficial effects that his testimony may have upon his own situation that provides the basis for such inquiry on cross-examination. *See Blunt v. United States*, 863 A.2d 828, 832 (D.C. 2004) (holding that defendant was entitled to cross-examine government witness as to his bias resulting from a charge in a different jurisdiction even though the prosecutor in the case at trial could not affect that charge). The trial court thus erred by implying that until a "deal" between Washington and the government was more imminent, cross-examination as to his motive to curry favor with the government was too speculative to permit cross-examination. Washington had a relationship with the government at the time he discussed Lewis' case with police, and Lewis was entitled to cross-examine him about the manner in which that relationship may have influenced his testimony.

■■■ Having found that the trial court erred, we must now determine whether that error is subject to review under the constitutional harmless error standard or under the abuse of discretion standard. This "depend[s] upon the scope of cross-examination permitted by the trial court measured against [this court's] assessment of the appropriate degree of cross-examination necessitated by" the particular situation. *See (Melvin) Brown v. United States*, 952 A.2d 942, 950 (D.C.2008). "Only by examining the facts can a court determine whether the alleged error was of constitutional magnitude, and it is only when the Sixth Amendment ... is satisfied that [this Court] will review more leniently for abuse of discretion." *Id.* As discussed below, we hold that the error did not amount to a constitutional one and that the trial court did not abuse its discretion by curtailing Washington's cross-examination in the manner that it did.

### B. Constitutional Error

■■■ While the exposure of a witness' motivation to testify is a proper function of cross-examination, the Sixth Amendment does not "prevent[ ] a trial judge from imposing any limits on defense counsel's inquiry into the potential bias of a prosecution witness." *Delaware v. Van Arsdall*, 475 U.S. 673, 678–79, 106 S.Ct. 1431, 89 L.Ed.2d 674 (1986). The Sixth Amendment "guarantees an *opportunity* for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense may wish." *Delaware v. Fensterer*, 474 U.S. 15, 20, 106 S.Ct. 292, 88 L.Ed.2d 15 (1985). Only when a trial court's limitation "prohibit[s] *all* inquiry into the possibility that [a witness] would be biased" as a result of favorable treatment from the government is the Sixth Amendment violated. *Van Arsdall, supra*, 475 U.S. at 679, 106 S.Ct. 1431. If a defendant is permitted to elicit facts sufficient to enable defense counsel to argue to the jury that the witness is biased, there is no constitutional error. *Gardner*

*v. United States,* 698 A.2d 990, 998 (D.C. 1997). To make cross-examination based upon witness bias effective (and thus satisfy the Sixth Amendment), defense counsel must be "permitted to expose to the jury the facts from which jurors ... could appropriately draw inferences relating to the reliability of the witness." *Davis v. Alaska,* 415 U.S. 308, 315, 94 S.Ct. 1105, 39 L.Ed.2d 347 (1974).

▮ In the instant case, because Lewis' counsel was permitted to elicit enough testimony from Washington to argue to the jury that he was biased because he had a motive to curry favor with the government—namely, to reduce his own drug sentence—the trial court did not violate Lewis' Sixth Amendment rights. In *Gardner, supra,* we held that there was no violation of the Sixth Amendment when the trial court permitted cross-examination of a victim of sexual assault about her friends' reactions to her story of rape but precluded questioning about her mental understanding of their belief of her story. 698 A.2d at 998. While *Gardner* is not wholly controlling because this line of questioning involved some level of speculation as to whether the victim's friends subjectively believed her, it is instructive because it dictates that precluding a witness from testifying as to her ultimate subjective belief, while allowing testimony regarding the underlying facts that might give rise to that belief, does not violate the Sixth Amendment. Analogously, in the instant case, defense counsel was able to elicit from Washington that he had been arrested for his own "drug distribution" case involving "crack" and "heroin" prior to discussing Lewis' case with police. From these details, Lewis could argue that Washington was biased in favor of the government because he wanted to curry favor in order to reduce his sentence for drug distribution. As in *Gardner,* the mere fact that defense counsel was precluded from asking about Washington's mental state at the time he spoke to police does not elevate this preclusion to the level of constitutional error.

Our holding here is consistent with our recent holding in *McClary v. United States,* 3 A.3d 346 (D.C.2010), in which we found that the appellant's Sixth Amendment rights were not violated when the trial court precluded cross-examination of a government witness about his juvenile convictions and probation status. Defense counsel in *McClary* was permitted to cross-examine the witness about "his immunity agreement, selling drugs on the night of the [crime on trial], the absence of a charge against him for selling drugs, and his initial refusal to cooperate with the government." *Id.* at 352. From this testimony, defense counsel was able "to argue that [the witness] had a motive to curry favor with the government...." *Id.* Because this level of cross-examination did not "completely prevent[ ]" the appellants in *McClary* "from exploring [the witness'] motive to curry favor with the government," there was no constitutional error. *Id.* at 352–53. The cross-examination permitted in the instant case was analogous to that of *McClary:* Lewis was able to elicit from Washington that he was charged with selling drugs, pled guilty to that charge, and initially did not cooperate with police in Lewis' case. As in *McClary,* we find no constitutional error in the trial court's limitation of Washington's cross-examination.

It is significant here that during Lewis' closing argument, his counsel was able to make the very argument to the jury that he now claims the trial court precluded him from eliciting on cross-examination. Lewis' counsel was permitted to pose this hypothetical to the jury in closing:

And what else do you know? Charles Washington also got himself in some

trouble, and then he also gave more information to the police. You know he testified in the grand jury after he had already had his drug charges reduced. And keep in mind, I told you at the beginning of this trial people's freedom was on the line. That's why they came and said what they said.

It is, therefore, clear that the trial court did not preclude Lewis from arguing Washington's bias to the jury. The absence of any limitation upon such argument in closing reinforces our holding that Lewis' constitutional rights were not violated.

Lewis' reliance upon *Davis, supra,* and its progeny in our decisions is misplaced. In *Davis,* the Supreme Court held that preclusion of *all* cross-examination regarding a witness' probationary status amounted to constitutional error because the witness was effectively portrayed as completely disinterested. 415 U.S. at 314, 94 S.Ct. 1105. The Court held that this preclusion amounted to constitutional error because even though "counsel was permitted to ask [the witness] *whether* he was biased, counsel was unable to make a record from which to argue *why* [he] might have been biased or otherwise lacked ... impartiality...." *Id.* at 318, 94 S.Ct. 1105 (emphasis added). Analogously, we found constitutional error when the trial court prohibited all cross-examination about a witness' conviction on the Maryland "stet" docket because doing so "disallowed an *entire line* of cross-examination" regarding bias and because the trial court should have permitted "at least *some*" cross-examination about that bias. *Blunt, supra,* 863 A.2d at 834 (emphasis added); *see also Coligan v. United States,* 434 A.2d 483, 485 (D.C.1981) (holding that the

trial court committed constitutional error when it refused to "permit any cross-examination" on the witness' pending drug charge, thereby failing to provide the jury with any information "that would have indicated to the jury that [the witness] might have had a motive for testifying favorably for the government").

The instant case is distinguishable from *Davis, Blunt,* and *Coligan* because the trial court did not "disallow an entire line" of cross-examination but merely disallowed questioning regarding Washington's ultimate subjective intentions when speaking to police and his knowledge of the potential length of his sentence. The trial court did permit defense counsel to elicit that Washington had multiple previous convictions for drug offenses and discussed Lewis' case with the government only after he had been "locked up on [his] own drug distribution case" when police raided his house and found "crack" and "heroin" inside. Defense counsel was allowed, over objection, to ask "how much heroin was inside [Washington's] house." Defense counsel was permitted to inquire if Washington was "talking to [the police] because [Washington] had been arrested in [his] own case." Finally, defense counsel was allowed, over objection, to elicit that, at the time he was arrested on the drug charges, Washington "had a feeling [he] would probably go to jail" after being prosecuted by "the same United States Attorneys Office" that was prosecuting Lewis. Because the trial court permitted defense counsel to elicit all of these facts from which it could—and did—argue its theory of Washington's motive to curry favor with the government, no constitutional error occurred.[4] Therefore, we review the trial

---

4. Lewis' reliance upon *Jenkins v. United States,* 617 A.2d 529 (D.C.1992), for the proposition that the trial court's preclusion of in-

quiry as to the length of Washington's potential sentence in his drug case amounts to constitutional error is similarly misplaced.

court's limitation on cross-examination under the more lenient standard of abuse of discretion.

### C. Abuse of Discretion

 It is within the trial court's discretion to set limits upon the extent of cross-examination on an appropriate subject to avoid "harassment, prejudice, confusion of the issues, [problems with] the witness' safety, or interrogation that is repetitive or only marginally relevant." *Gardner, supra,* 698 A.2d at 998. When exercising this discretion, the trial court "must balance the importance of the subject matter and the credibility of the witness against the degree of cross-examination permitted." *Brown, supra,* 952 A.2d at 942 (citation omitted). This review "cannot be reduced to a definitive abstract formula, but rather must be evaluated in light of the specific circumstances presented by each case." *Springer v. United States,* 388 A.2d 846, 854 (D.C.1978), *overruling on other grounds recognized by Bassil v. United States,* 517 A.2d 714 (D.C. 1986). Even when this court determines that the trial court erred by limiting cross-examination, reversal is only warranted where it results in prejudice. *Gardner, supra,* 698 A.2d at 998. To determine whether the appellant's case was prejudiced by the limitation, we consider factors such as the importance of the individual witness to the case, whether the witness is a participant in the crime on trial, whether the witness' testimony goes to an essential element of the crime, and the amount of corroboration of the witness' testimony. *Springer,* 388 A.2d at 855–56.

Here, Washington was a key witness, but only because he provided a motive for Lewis to have committed an otherwise random act of violence against a fellow drug abuser. Washington was not a participant in the crimes with which Lewis was charged, and his testimony did not go to an essential element of arson, destruction of property, or obstruction of justice. Most importantly, the most damning evidence of Lewis' guilt came from the other witnesses—Carol Russell, Catherine Mitchell, Franklin James, Daniel Harris, and Jermaine Washington—who testified that Lewis admitted on multiple occasions that he committed the crimes. Additionally, Washington's testimony regarding Lewis' collaboration with Holston in exchange for drugs and cash was corroborated by inference through other witnesses' testimony that Lewis went to obtain free drugs and cash, entered a van associated with Holston, and shortly thereafter returned with a large amount of drugs. Because there was such strong evidence of Lewis' guilt, and because defense counsel was permitted to elicit from Washington facts that provided the jury with an inference of Washington's bias, we cannot say that the trial court's improper limitation upon Washington's cross-examination prejudiced his defense.

The *Jenkins* court held that the disallowance of questioning as to both the witness' potential sentence *and* the underlying charge precluded the jury from drawing appropriate inferences about the witness' motive to curry favor. *Id.* at 533. The foreclosure of questioning regarding "the exact nature of the crime underpinning" the witness' sentence gave rise to constitutional error, rather than simply the foreclosure of questioning regarding the potential sentence. *Id.* at 532. Here,

in contrast, defense counsel was given latitude to question Washington about the precise nature of his underlying offense, the timing of his discussions with police, and his understanding that he faced jail time. As a result, while it may have been error not to allow defense counsel to inquire about the specific length of the sentence Washington faced, we cannot say that it was an error of constitutional dimension.

Therefore, because the error was neither constitutional nor an abuse of discretion, we affirm the trial court's limitation upon Washington's cross-examination and, therefore, also affirm Lewis' convictions for MDP and obstruction of justice.

### III.

We turn now to Lewis' second argument, that the government presented insufficient evidence that Lewis possessed the required *mens rea* to support his arson conviction. For the reasons set forth below, we hold that there was insufficient evidence to prove that Lewis acted maliciously when he set the fire, and, therefore, his arson conviction must be reversed.

### A. Standard of Review

■■■■ Although the government contends that plain error review should govern Lewis' appeal of his arson claim, this argument is unpersuasive, and our more familiar standard of review for sufficiency of evidence applies. The rule that the "grounds for a [motion for a judgment of acquittal] need not be stated with specificity unless the prosecutor so requests" is "of ancient lineage...." *Newby v. United States,* 797 A.2d 1233, 1237–38 (D.C.2002) (citation omitted). "Even though a general motion for acquittal is broadly stated, without specific grounds, it is deemed sufficient to preserve the full range of challenges to the sufficiency of evidence." *Id.* at 1238. In contrast, where the defense "fails to make even a general motion for a judgment of acquittal in a jury trial ... the plain error test" will govern this court's review. *Id.* at 1238 n. 2. When a defendant moves for a judgment of acquittal both at the close of the government's case and at the close of all of the evidence, the trial court's denial of the first motion is not appealable and this court will review only the denial of the second motion. *See Washington v. United States,* 475 A.2d 1127, 1128–29 (D.C.1984).

■■■■ Here, Lewis made two motions: one at the close of the government's evidence, and another at the close of all evidence. At the close of all evidence, Lewis "renew[ed his] motion for judgment of acquittal as to all counts, and ... rest[ed] on the evidence introduced at trial." Lewis did not specify grounds for this motion, and thus, under *Newby, supra,* it is sufficient to preserve "the full range of challenges to the sufficiency of evidence." 797 A.2d at 1238. Thus, upon review of Lewis' sufficiency of evidence claim, we must "deem the proof of guilt sufficient if, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt," giving "full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Cox v. United States,* 999 A.2d 63, 68 (D.C.2010) (internal quotation marks omitted).

Mindful of this standard, because Lewis does not challenge the *actus reus* of setting the fire in question, we now address the sole issue of whether the government presented sufficient evidence that Lewis acted with the required *mens rea* of malice when he set fire to the vacant House. Under D.C.Code § 22–301 (2001), a defendant is guilty of arson if he "*maliciously* burn[s] ... any dwelling, or house ... or any other building ... of another person...." (Emphasis added). Lewis argues that although he did burn the House, it was a vacant house and he merely intended a small-scale fire sufficient only to conceal Stewart's body, and therefore he did not act maliciously. We agree.

## B. Malice

The parties dispute whether, in order to find that Lewis acted "maliciously," the jury must find that Lewis acted "in conscious disregard of a known and substantial risk that his actions would endanger human life,"[5] as instructed by the trial court. Although the government suggests otherwise, to convict Lewis on a charge of arson, the government must indeed prove that Lewis acted with a conscious disregard of the substantial risk that setting the fire threatened human life.

To find that a defendant acted maliciously, we have held that it is not necessary that a jury find that he "intended the actual harm which resulted from his wrongful act...." *Gonzalez v. United States*, 859 A.2d 1065, 1067 (D.C.2004) (citation omitted) (discussing malice in the context of MDP, not arson). Instead, we have defined "maliciously" to mean "not merely negligently or accidentally," but with "a conscious disregard of a known substantial risk of the harm which the statute is intended to prevent." *Id.* For this reason, the government argues, because the statute is intended to prevent damage to property (rather than persons), Lewis can be convicted of arson even if he only consciously disregarded a substantial risk of harm to the *building* in which he set the fire, rather than a risk to human life. We disagree.

In differentiating between the offenses of arson and MDP, we have held that endangerment of human life is a necessary element of the crime of arson. *Logan v. United States*, 460 A.2d 34, 37 (D.C. 1983), *abrogated on other grounds by Robinson v. United States*, 608 A.2d 115, 116 (D.C.1992). "The offense of malicious destruction of property protects against injury or harm merely to property," whereas "[a]rson, in contrast, involves conduct endangering human life and offending the security of habitation or occupancy." *Id.* We reiterated this distinction in *Phenis v. United States*, 909 A.2d 138, 163–64 (D.C. 2006), in which we held that to amount to a *mens rea* of malice, the government must prove that a defendant charged with arson "acted intentionally, and not merely negligently or accidentally, while consciously *disregarding the risk of endangering human life* and offending the security of habitation or occupancy." *Id.* (citing *Logan, supra,* 460 A.2d at 37) (emphasis added); *see also Gilmore v. United States*, 742 A.2d 862, 870 (D.C.1999) (same).[6] Thus, based on our prior decisions, it is clear that to convict a defendant of arson, the government must prove his maliciousness by introducing sufficient evidence that he acted in conscious disregard of a known and substantial risk that his actions would endanger human life.[7]

---

5. The government does not argue that Lewis' actions met either of the other two alternative formulations of *mens rea* sufficient to sustain a conviction of arson, namely, that he acted "with intent to kill or seriously injure another person" or "with the intent to threaten the security of anyone who lived in or occupied that building or other property." CRIMINAL JURY INSTRUCTIONS FOR THE DISTRICT OF COLUMBIA, No. 4.33(4) (4th ed. rev. 2008).

6. The government's reliance upon our decision in *In re W.B.W.,* 397 A.2d 143 (D.C. 1979), is misplaced because although in that case we briefly referred to the elements of

arson, we did so only to highlight that the element of value above $200, a necessary element of the crime of MDP (the relevant charge in *W.B.W.*), is not among the elements of arson; our opinion in *W.B.W.* does not purport to explain the offense of arson in any depth.

7. While we believe this "risk to human life" requirement is proper for the crime of arson, even if we were to disagree with our prior holdings in *Logan* and *Phenis*, we are bound by those decisions. *See M.A.P. v. Ryan*, 285 A.2d 310 (D.C.1971). It would be inappropriate for us to consider removing or eliminating

## C. Risk to Human Life under the Facts of This Case

■ Having determined that in order for Lewis' arson conviction to stand, the government must prove that he acted with a conscious disregard of a substantial risk to human life when setting the fire, we turn now to the evidence adduced at trial to assess its sufficiency on that issue. Because we believe that a conviction for arson under the facts in this case would eviscerate any distinction between arson and MDP, we hold that the evidence failed to meet its burden and reverse Lewis' arson conviction, mindful of the fact that Lewis has already been convicted of MDP and has not challenged that conviction.

None of our opinions assessing the sufficiency of evidence in arson cases is particularly instructive or comparable to the instant case because those opinions involve arsons in which the defendant unquestionably disregarded a substantial risk of endangering human life. *See, e.g., In re D.M.*, 993 A.2d 535 (D.C.2010) (schoolchildren lit fire in occupied school); *Phenis, supra*, 909 A.2d at 138 (defendant set fire in occupied apartment building); *Gilmore, supra*, 742 A.2d at 862 (defendant threw Molotov cocktail at occupied house); *Byrd v. United States*, 705 A.2d 629, 631 (D.C. 1997) (defendant set fire in attic where children were sitting). In the instant case, there is no controversy over whether a fire was set or the identity of the igniter, and these cases offer no real guidance to resolve the *mens rea* issue now before us.

In contrast, our precedents regarding the offense of MDP, as opposed to arson, do offer some insight regarding the *mens rea* issue. As stated above, the distinction between arson and MDP is that arson protects against endangerment of human life whereas MDP merely protects against

endangerment of property. *See Logan, supra*, 460 A.2d at 37. With this distinction in mind, a review of this court's decision in *Thomas v. United States*, 557 A.2d 1296 (D.C.1989), is instructive. In *Thomas*, the defendant was a demonstrator who set fire to a wooden contraption he had constructed and placed on the sidewalk in front of the Old Executive Office Building in order to protest nuclear proliferation. When the defendant set the contraption ablaze, it caused significant damage to stone columns and walls of the building, and the defendant was convicted of MDP as a result. The defendant did not dispute setting the fire, but claimed that he had no idea that the granite column would be damaged by any blaze and, therefore, did not possess the requisite *mens rea* of maliciousness.

In *Thomas*, we undertook an extensive review of the meaning of the term "malicious" in the context of the offense of MDP, ultimately remanding the case for a new trial because the prosecutor had improperly argued the standard of maliciousness in his closing argument. *Id.* at 1305. In the MDP context, we held that:

> 'Malice' in the legal sense imports (1) the absence of all elements of justification, excuse or recognized mitigation, and (2) the presence of *either* (a) an actual intent to cause the particular harm which is produced or harm of the same general nature, *or* (b) the wanton and willful doing of an act *with awareness of a plain and strong likelihood that such harm may result.*

*Id.* at 1299 (citing *Charles v. United States*, 371 A.2d 404 (D.C.1977)). The difference between general recklessness and "recklessness which displays depravity and such extreme and wanton disregard for human life as to constitute 'malice' ... lies

the "risk to human life" element as a panel, rather than when sitting *en banc*. *See id.*

in the quality of the awareness of the risk." *Id.* (citing *Carter v. United States,* 531 A.2d 956, 963 (D.C.1987) (discussing difference in context of murder vs. manslaughter)). Because of this distinction, the ultimate issue in determining malice is that of the subjective state of mind of the defendant, rather than that of a reasonable person. *Id.* What a reasonable person would have thought is still relevant, though, since in situations when the defendant himself does not testify, a reasonable person standard is "often the best available evidence that the defendant was aware" of the risk. *Id.* Nevertheless, the prosecutor must still "further show ... that the defendant was subjectively aware of the risk in question" to find malice. *Id.* In sum, the *Thomas* court held that a proper instruction to the jury (to cure the prosecutor's closing argument misstatements regarding a reasonable person standard) should have stated that "the ultimate issue was [the *defendant's* state of mind], and that what a reasonable man would have foreseen, while relevant as to what [the defendant] could have foreseen, was not conclusive." *Id.* at 1304.

■ Applying this malice standard to the crime of arson, which, as discussed above, contains an element of endangerment of human life, to sustain a conviction for arson, the prosecutor must show that Lewis was subjectively aware of the risk of endangerment of human life when he set the fire and that he consciously disregarded that risk. What a reasonable person would have foreseen in Lewis' situation is relevant to this determination but is not conclusive. While in *Thomas* we had the opportunity to hear the defendant's own testimony regarding his state of mind at the time of the fire, Lewis did not take the stand in his own defense, and therefore his subjective belief is much more difficult to discern in the instant case. Nevertheless, even viewing the evidence provided at trial

in the light most favorable to the government, we cannot find that the prosecution adduced sufficient evidence that Lewis was aware of a substantial risk to human life and consciously disregarded it, and therefore, under the narrow confines of the facts of this case, we reverse his arson conviction.

If we were to affirm Lewis' arson conviction under the facts of this case, any meaningful distinction between arson and MDP would be effectively destroyed. Lewis used gasoline to set fire to Stewart's body in a vacant home next to, but detached from, other vacant homes. The government argues that "there is no evidence that [Lewis] actually knew that" the house was vacant and that crime scene photographs of debris near the adjacent house indicate that the fire could have posed a risk to human life. Because the house that Lewis burned and the adjacent house "[did] not appear ... to be obviously vacant," the government argues, Lewis consciously disregarded a risk of endangering any persons inside those houses.

■ This argument fails because none of this evidence demonstrates Lewis' subjective state of mind when setting the fire, which, as we noted above, is "the ultimate issue." *See Thomas, supra,* 557 A.2d. at 1299. While the evidence cited by the government may indicate what a reasonable person might have thought when setting an identical fire, it is far from conclusive as to what Lewis himself believed the risks to be when setting the fire. To convict Lewis of arson under these facts would elevate all incidents of burning property in an urban setting—which encompasses nearly all of our jurisdiction—from offenses of MDP into arson. In order to maintain any meaningful distinction between those two offenses, there must be some additional evidence from which a

factfinder can infer a conscious disregard of a risk of endangering human life. The prosecution failed to carry its burden to present such evidence in this case, and therefore, we are compelled to reverse Lewis' arson conviction.[8]

## IV.

Accordingly, we affirm Lewis' convictions for malicious destruction of property and obstruction of justice, and we reverse his conviction for arson.

*So ordered.*

**8.** The government offers two alternative arguments as to why Lewis' actions were malicious, neither of which we find persuasive. First, the government cites to numerous federal cases in which the courts of appeal decided whether to apply a sentencing enhancement after a conviction for arson. *See United States v. Farish,* 535 F.3d 815 (8th Cir.2008); *United States v. Golden,* 954 F.2d 1413 (7th Cir.1992). We find all of these cases to be inapposite because the sentencing enhancement is permitted when various factors are proven only by a preponderance of the evidence, rather than beyond a reasonable doubt, which is the standard at issue in this appeal. *See United States v. Karlic,* 997 F.2d 564, 569 (9th Cir.1993). Additionally, many of the federal cases to which the government directs our attention addressed a prior version of the sentencing enhancement guideline that permitted enhancement if the actions at issue were undertaken merely recklessly, rather than with the higher *mens rea* of maliciously. *See Golden, supra; United States v.*

*Foutris,* 966 F.2d 1158 (7th Cir.1992); *United States v. Guadagno,* 970 F.2d 214 (7th Cir. 1992); *United States v. Medeiros,* 897 F.2d 13 (1st Cir.1990). Thus, because of the different standards involved, these cases are not helpful to our analysis here.

Second, the government contends that by setting a fire which he knew would require the intervention of firefighters to extinguish, Lewis consciously disregarded a substantial risk to the lives of the firefighters. While there is some merit to this argument, our research shows that in states in which a risk to firefighter safety satisfies an element of arson, this decision has been made by the legislature. *See, e.g.,* CONN. GEN.STAT. § 53a–111 (a)(4) (1982); OHIO REV.CODE ANN. § 2909.01(A) (2004); 18 PA. CONS.STAT. § 3301 (2007). In light of these statutes applicable in other states, we refrain from extending the "risk of harm to human life" element to include a risk to responding emergency personnel since we believe the legislature is more apt to make such a change in our arson law.