*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

# DISTRICT OF COLUMBIA COURT OF APPEALS

No. 18-CF-157

COREY T. HOWARD, APPELLANT,

V.

UNITED STATES, APPELLEE.

Appeal from the Superior Court
of the District of Columbia
(CF2-11268-17)

(Hon. Ronna Beck, Motions Judge)
(Hon. Juliet McKenna, Trial Judge)

(Argued March 11, 2020                                    Decided November 19, 2020)

*Jennifer Williams*, with whom *Samia Fam* and *Shilpa Satoskar*, Public Defender Service, were on the brief, for appellant.

*Michael E. McGovern*, Assistant United States Attorney, with whom *Jessie K. Liu*, United States Attorney at the time the brief was filed, and *Elizabeth Trosman*, *Elizabeth H. Danello*, and *Emile C. Thompson*, Assistant United States Attorneys, were on the brief, for appellee.

Before GLICKMAN, *Associate Judge*, and WASHINGTON and FISHER,[*] *Senior Judges*.

_____

[*] Judge Fisher was an Associate Judge of the court at the time of argument. His status changed to Senior Judge on August 23, 2020.

FISHER, *Senior Judge*:  Appellant Corey Howard challenges his convictions for one count of Unlawful Possession of a Firearm (prior felony conviction), D.C. Code § 22-4503(a)(1); one count of Possession of an Unregistered Firearm, D.C. Code § 7-2502.01; one count of Unlawful Possession of Ammunition, D.C. Code § 7-2506.01(a); and two counts of Possession of a Large Capacity Ammunition Feeding Device, D.C. Code § 7-2506.01(b).  His appeal asserts that:  (1) the trial court abused its discretion when it refused to issue a missing evidence instruction sanctioning the government for its failure to preserve certain items found in a backpack alongside a magazine for the Glock 17; and (2) the trial court violated his Sixth Amendment rights by limiting defense counsel's questioning of Officer Mark Minzak, which was intended to demonstrate bias.  We affirm.

## I.  Background

On June 29, 2017, appellant Howard was a passenger in a Toyota Corolla that was pulled over for failing to come to a complete stop at a stop sign.  An officer testified that, after the police activated their emergency lights, "we saw the front passenger look over his shoulder at us, and then lean forward and then lean back in the seat."  Based on their training and experience, the officers believed the movements indicated that appellant was trying to hide something.  Five officers, all

members of the Gun Recovery Unit ("GRU"), approached the car after it pulled over. One officer, Officer Hugee, drew his gun while approaching; the government explained that he did so because the car's side windows were "heavily tinted" and it was difficult to see "what [was] going on inside the car." Appellant was ordered to step out of the vehicle, at which point an officer conducted a protective pat down; the officer testified that appellant was "shaken," "very nervous," and "looking towards the inside of the vehicle while I'm talking to him."

By shining a flashlight through the front windshield and illuminating the area underneath the front passenger seat, four different officers were able to see the barrel of a firearm.[1] The gun was located on top of a piece of paper and a security services identification badge[2] and was identified as a Glock 17. The gun contained a "standard 17-round magazine" and ammunition.

After discovering the handgun, the officers searched the car, including the trunk, which contained a number of bags and loose items. One bag is relevant to this appeal: a black backpack, in which Officer Minzak found an additional 17-

_____

[1] Appellant moved to suppress the gun, but the trial court determined that the traffic stop was lawful and the firearm was discovered in plain view. Howard does not challenge that ruling on appeal.

[2] The badge identified someone other than appellant.

round magazine for a Glock 17, such as the one found underneath the passenger seat. The backpack also contained a number of other items, including a job application with Howard's name on it, a size-Large black hoodie, a size-XXL long-sleeve shirt, and a pair of jeans. Those items were preserved by police and taken into evidence, along with the backpack itself. Officer Minzak testified that the police preserved those items because they were "pertinent or relevant to the arrest of Mr. Howard," and that he focused on items that he thought were a "priority" and "important to the case."

Other items in the backpack were not taken into police custody. They were instead left in the trunk of the car, which was driven away by appellant's brother. Some of the other items that were in the backpack are visible in a photograph of the backpack, and an unidentified number of additional items may have been discarded before the photograph was taken. Smaller items in the photograph are difficult to see clearly, but the photograph shows, at a minimum, a key, "tissue paper," a "yellow thing," a "silver" item, and a "green piece of material" that may have been a bag.

Defense counsel initially moved to dismiss the indictment for failure to preserve the complete contents of the backpack. After that motion was denied,

defense counsel requested a missing evidence instruction with respect to "items in the backpack that the officers on scene chose not to recover," "other items in the trunk" that were not collected, and the identification badge that was underneath the gun. The trial judge denied the request, reasoning that, in light of the photograph and the ability of defense counsel to argue why the missing items mattered, "it would be overstating to give an actual missing evidence instruction." Appellant asserts that the judge abused her discretion in denying a missing evidence instruction, which he contends was necessary to sanction the government for its failure to keep all of the backpack's contents.

The second issue on appeal involves the scope of cross-examination concerning whether Officer Minzak was biased because he had a motive to curry favor with the government. Prior to trial, defense counsel subpoenaed documents from the Office of Police Complaints ("OPC") relating to the officers involved in appellant's arrest. OPC provided documentation about one closed complaint and three pending investigations, only one of which is relevant on appeal. In that matter, the complainant alleged that Officer Minzak had used excessive force and harassed him during a traffic stop on May 12, 2017. The complainant also alleged that he was injured because of the officers' rough treatment and that the officers had approached the vehicle with guns drawn. Defense counsel argued that the risk

the investigation posed to Officer Minzak's career generated a classic form of bias — motive to curry favor with the government — and sought to obtain more information about the incident giving rise to the investigation.[3]

The motions judge, Judge Beck, issued a protective order forbidding defense counsel from contacting the complainant, and the trial judge, Judge McKenna, declined to amend the order. Judge McKenna explained that efforts to contact the complainant and/or create extrinsic evidence from any information gleaned could unduly impact the pending investigation and invade the privacy of the complainant. Additionally, she reasoned that "outside information that Officer Minzak is not currently aware of[] could have no bearing on his current view of the gravity of the situation," making it inappropriate "to try to introduce before the jury prior bad acts which have not even been established through a substantiated investigation" and risking "a mini trial on the subject of the pending OPC complaint."

_____

[3] The appellant also argued that there was evidence of corruption bias, "a distinct subset of bias evidence demonstrating a willingness to give false testimony." *(Shawn) Smith v. United States*, 180 A.3d 45, 52 (D.C. 2018) (internal quotation marks and citation omitted). However, as corruption bias is not presented as an issue on appeal, we do not address it at length.

At trial, defense counsel cross-examined Officer Minzak on the following topics: (1) asking whether there was a pending OPC investigation for harassment and use of excessive force; (2) establishing that the investigation was pending at the time of his testimony as well as at the time of the traffic stop in this case; (3) exploring the allegations in the complaint, including confirmation that the OPC complainant reported that he was injured during the encounter; and (4) detailing the potential consequences for Officer Minzak if the complaint was sustained, including losing his job and the possibility of criminal charges being filed by the United States Attorney's Office if OPC found that he injured a civilian. Appellant now claims that restrictions placed on examining Officer Minzak deprived the defense of a sufficient opportunity to explore his potential bias and thus violated the Sixth Amendment.

Before closing arguments, the trial judge reminded counsel that she could "argue inferences that could be drawn" about the failure to preserve the other contents of the backpack or about the sloppiness of the police work more generally, but counsel decided to focus elsewhere. As to the importance of the OPC investigation, defense counsel emphasized to the jurors that Officer Minzak was "being investigated for stopping a car for a traffic violation, for guns being drawn, for searching the car, for injuring the victim." She argued that those

circumstances gave Officer Minzak "a motive to make this seem legit. It gives these officers a motive to make it . . . seem like it was a legitimate practice to go upon that Corolla holding a gun." Counsel highlighted that "Officer Minzak . . . faces penalties . . . if he is found to have violated that other young man's rights." After noting that he could get fired and he could get suspended without pay, counsel argued that those looming possibilities gave Officer Minzak "a reason to want to convert his testimony" and "to conceal key facts from his statements to you."

## II. Legal Analysis

## A. Rule 16 and the Contents of the Backpack

Appellant argues that the failure to preserve the full contents of the backpack violated Superior Court Criminal Rule 16 ("Rule 16"). We construe Rule 16 *de novo* and review the decision to deny a missing evidence instruction for abuse of discretion. *Weems v. United States*, 191 A.3d 296, 300 (D.C. 2018). Rule 16(a)(1)(E) states, in relevant part, that "the government must permit the defendant to inspect and to copy or photograph . . . tangible objects . . . if the item is within the government's possession, custody, or control and: (i) the item is material to preparing the defense; . . . or (iii) the item was obtained from or belongs to the defendant." Evidence in police possession is considered to be within the "custody

or control" of the government. *Robinson v. United States,* 825 A.2d 318, 327 (D.C. 2003). To establish materiality, appellant must demonstrate "a relationship between the requested evidence and the issues in the case, and there must exist a reasonable indication that the requested evidence will either lead to other admissible evidence, assist the defendant in the preparation of witnesses or in corroborating testimony, or be useful as impeachment or rebuttal evidence." *Buchanan v. United States*, 165 A.3d 297, 304 (D.C. 2017). "The defense must show more than that the item bears some abstract logical relationship to the issues in the case. There must be some indication that the pretrial disclosure of the item would enable the defendant significantly to alter the quantum of proof in his favor." *Id.* (internal quotation marks and ellipses omitted).

> This Rule 16 duty to permit pretrial discovery entails an antecedent duty to preserve material that the government has obtained and knows or should know is discoverable. However, these duties of preservation and disclosure extend only to evidence that actually is within the possession, custody, or control of the government; they do not presuppose any duty on the part of the government to acquire evidence it does not have from private parties or other outside sources.

*Weems*, 191 A.3d at 300-01 (footnotes omitted).

"If a trial court concludes that the government's failure to preserve evidence constituted a violation of Rule 16, 'in fashioning the appropriate sanction, the court should weigh the degree of negligence or bad faith involved, the importance of the evidence lost, and the evidence of guilt adduced at trial.'" *Tann v. United States*, 127 A.3d 400, 489 (D.C. 2015) (quoting *Robinson*, 825 A.2d at 331). "The trial court may select from the 'extremely broad' range of sanctions for corrective action that is 'just under the circumstances.'" *Id.* (quoting *Tyer v. United States*, 912 A.2d 1150, 1165 (D.C. 2006)).

Appellant argues that the court was required to give a missing evidence instruction.[4] Such an instruction informs the jurors that they may "infer from the failure to preserve the [evidence] that it would be unfavorable" to the party that failed to preserve it. *Battocchi v. Washington Hosp. Ctr.*, 581 A.2d 759, 764 (D.C. 1990).

_____

[4] Appellant occasionally uses broader language implying that another sanction could be acceptable, such as stating that "[t]he court abused its discretion in declining to impose a missing evidence instruction *or other sanction*." However, appellant never develops an argument in favor of an alternative sanction. We therefore focus on his claim that, "[h]ad the court properly applied the law, it would have been *compelled* to give a missing evidence instruction" (emphasis added).

> The party seeking a missing evidence instruction must make a twofold showing.  First, the evidence must be likely to elucidate the transaction at issue; second, it must be peculiarly available to the party against whom the adverse inference is sought to be drawn.  Moreover, we have recognized several dangers inherent in the use of a missing evidence instruction, since it represents a radical departure from the principle that the jury should decide the case by evaluating the evidence before it.

*Tyer*, 912 A.2d at 1164 (citations, brackets, and quotation marks omitted).  Those dangers are described well in *Thomas v. United States*, 447 A.2d 52, 58 (D.C. 1982).

> A primary function of jury instructions, as well as the rules of procedure and evidence, is to confine the jury's attention to firsthand testimony from those with personal knowledge of relevant facts, which may be probed on cross-examination, thereby excluding conjecture. The missing witness inference represents a radical departure from this paradigm, for it essentially creates evidence from non-evidence.  The risk is always present that the jury will give undue weight to the presumed content of testimony *not* presented, and insufficient weight to that which *was* presented.

"The trial court . . . has considerable discretion in considering the degree of negligence or bad faith involved in the failure to preserve evidence" and it "retains considerable latitude to refuse to give a missing evidence instruction, where it

determines from all of the circumstances that the inference of unfavorable evidentiary value is not a natural or reasonable one." *Tyer*, 912 A.2d at 1164, 1166 (internal quotation marks and brackets omitted).

Assuming, without deciding, that the failure in this case to preserve all the contents of the backpack resulted in a violation of the Rule 16 duty to disclose evidence material to the defense, we discern no abuse of discretion in the trial court's decision to deny the request for a missing evidence instruction. The trial court acted within its "considerable latitude," *Tyer*, 912 A.2d at 1166, in finding that there was no bad faith on the government's part and that "a missing evidence instruction would really overstate the evidence."

The officers' state of mind is key to determining whether the adverse inference associated with a missing evidence instruction would be "a natural or reasonable one." *Tyer*, 912 A.2d at 1166. Simply put, if an officer has acted in bad faith in destroying evidence, it is a more natural inference that he thought the evidence would have been harmful to the case against the defendant than if the officer was merely forgetful or negligent.

The motions judge found that, rather than "cherry-picking" evidence, as defense counsel had suggested, the officers were making a practical decision whether it was worth placing "on the property books" "tissue" and other items that appeared, frankly, to be unimportant or even trash. The trial judge did not discern any bad faith, either,[5] instead deciding that the photograph and defense counsel's ability to argue the issue to the jury sufficed to mitigate any harm. She found that giving a missing evidence instruction would be "overstating" the importance of the issue.

We defer to the trial court's determination that the officers' decision-making was driven by the lack of apparent value of the other items, rather than by an attempt to hide evidence from the defense. *See Koonce v. District of Columbia*, 111 A.3d 1009, 1014 (D.C. 2015) ("We will disturb the trial court's findings that the government did not act in bad faith or was not grossly negligent only if those findings are plainly wrong or without facts to support them.") (brackets and

_____

[5] The trial judge, in making her ruling, did not explicitly characterize the officers' state of mind. However, we can infer from her comments that she did not believe they were acting in bad faith or with gross negligence, as she emphasized their attempts to preserve the items through photographs, agreed with the government that failing to preserve other items was understandable "given that no contraband was recovered," and declined to give the instruction because any additional evidence preserved would have been "cumulative of what the jury already had."

internal quotation marks omitted). Here, the photograph, though imperfect, was an indication of the officers' good faith. Moreover, as noted by the motions judge, "it wasn't that" the items "were thrown out; they were put in the trunk and stayed with the car where they were initially found." We agree that officers intending to obstruct the defendant's access to evidence would be unlikely to leave the items with his brother.

Appellant relies on *(Damian) Smith v. United States*, 169 A.3d 887 (D.C. 2017), arguing that, when an item is of singular importance in tying a defendant to contraband, failing to preserve demonstrates gross negligence. But this backpack is not analogous to the shorts in *Smith*.[6] The firearm was found under Howard's seat, not in the backpack. Failing to preserve items in the backpack without obvious significance, such as the "yellow thing," "silver" item, and "green piece of material," is not akin to failing to preserve the shorts in *Smith* — which were the

---

[6] In *Smith*, officers encountered the defendant in his girlfriend's apartment while he was on the couch, wearing boxer briefs. Officers asked if he could put on pants; his girlfriend offered a pair of shorts, but Smith claimed that they were not his. Officers found drugs in the shorts and charged Smith with possession with intent to distribute a Schedule I controlled substance. However, the officers failed to preserve the shorts as evidence. Reasoning that "unless the government could prove that the shorts in which the drugs were found belonged to Smith, there could be no conviction," the court held that the obvious evidentiary value of the shorts meant that the failure to preserve them was grossly negligent. 169 A.3d at 892-94.

only piece of evidence that could tie the defendant to the drugs. The two crucial differences are thus that the shorts were of obvious significance, while the importance of the unpreserved items here is speculative, and the missing shorts in *Smith* were the only piece of evidence that could link the defendant to the drugs, while additional evidence was preserved here that could link appellant to the gun.

We see no reason to disturb the trial court's conclusions when the discarded items did not have apparent inculpatory or exculpatory value; the officers made an effort to photographically record the contents of the backpack; the remaining items were left with the defendant's brother, rather than deliberately destroyed to "hinder preparation of the defense case";[7] and there were not any other indicia of nefarious intent. In these circumstances, we cannot agree with appellant's argument that the officers' actions and omissions make the adverse inference natural or reasonable.

We next turn to the importance of the items lost and the evidence of guilt adduced at trial. *Tann*, 127 A.3d at 489. Because the missing evidence instruction is such a radical departure from our preference for deciding cases based upon the evidence presented, when lost items are relatively unimportant or the evidence of guilt is particularly powerful, we are reluctant to say that a trial judge *must* issue an

_____

[7] *Kaliku v. United States*, 994 A.2d 765, 778 (D.C. 2010).

instruction drawing special attention to "the presumed content of [evidence] *not* presented." *Id.* (emphasis in original); *see also Thomas*, 447 A.2d at 57 (reasoning that the lost testimony must have been "noncumulative" and "an important part of the case" because "[a]bsent these conditions, the logical basis for the inference evaporates, for nothing can reasonably be inferred from the failure to call a witness who would not be expected to contribute additional pertinent facts to the trial.")

We recognize the force of appellant's complaint that it is difficult to proffer the relevance of evidence that he cannot view. However, it is not apparent how *any* of the items apart, perhaps, from the key could have played any role in preparing for trial. In an ordinary missing evidence case, the court knows what is missing and has a reasonably good idea why it could be relevant. Here, we are instead left to speculate; all we know for certain is that many of the items not preserved were *not* significant, such as the "yellow thing," "silver" item, and "green piece of material." Counsel for appellant attempted to surmount these challenges at oral argument by suggesting that even if the defense team had been unable to locate the owner of the key, they could have tried the key at Howard's dwelling and demonstrated that it was not his. In other words, even if the defendant could not point the finger at any particular third party, he could present a theory that the backpack was shared, and the magazine was not his.

Appellant's argument is based entirely on speculation. It is, of course, equally plausible that the key was Howard's and that it would have provided additional evidence of his guilt. And though identifying the backpack as Howard's was important, the weapon was found underneath appellant's seat after officers watched him lean forward and then sit back up when he saw that the car was being pulled over.[8] When the exculpatory value of the key was wholly speculative, when there was additional evidence outside of the backpack linking the gun to Howard, and when other evidence indicated that the backpack and its contents were indeed Howard's, we cannot say that the trial court abused its discretion in declining to give a missing evidence instruction that could bring "undue weight to the presumed content of [evidence] *not* presented, and insufficient weight to that which *was* presented." *Thomas*, 447 A.2d at 58 (emphasis in original).

### B. Cross-Examination and the OPC Investigation

Our decision in *Lewis v. United States*, 10 A.3d 646, 653-54 (D.C. 2010), summarizes the considerations for determining the standard of review that applies

_____

[8] Appellant attempts to dismiss the power of this testimony by stating that the officers were "heavily impeached." This argument fits awkwardly with appellant's claim that the defense was denied the opportunity to effectively cross-examine Officer Minzak. We do not agree with appellant's argument that the testimony of the officers held little value.

when a trial judge has imposed limits on defense counsel's cross-examination of a prosecution witness for bias:

> While the exposure of a witness' motivation to testify is a proper function of cross-examination, the Sixth Amendment does not "prevent [ ] a trial judge from imposing any limits on defense counsel's inquiry into the potential bias of a prosecution witness." *Delaware v. Van Arsdall,* 475 U.S. 673, 678–79 (1986). The Sixth Amendment "guarantees an *opportunity* for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense may wish." *Delaware v. Fensterer,* 474 U.S. 15, 20 (1985). Only when a trial court's limitation "prohibit[s] *all* inquiry into the possibility that [a witness] would be biased" as a result of favorable treatment from the government is the Sixth Amendment violated. *Van Arsdall, supra,* 475 U.S. at 679. If a defendant is permitted to elicit facts sufficient to enable defense counsel to argue to the jury that the witness is biased, there is no constitutional error. *Gardner v. United States,* 698 A.2d 990, 998 (D.C. 1997). To make cross-examination based upon witness bias effective (and thus satisfy the Sixth Amendment), defense counsel must be "permitted to expose to the jury the facts from which jurors . . . could appropriately draw inferences relating to the reliability of the witness." *Davis v. Alaska,* 415 U.S. 308, 315 (1974).

As in *Lewis*, "[i]t is significant here that during [appellant's] closing argument, his counsel was able to make the very argument to the jury that he now claims the trial court precluded him from eliciting on cross-examination." 10 A.3d at 654. If there is no constitutional error, we review for abuse of discretion. *Id.* at

656. When exercising that discretion, "[t]he trial judge must balance the probative value of the evidence against the risk of prejudicial impact, including the risk of jury confusion from a trial-within-a-trial, and may exclude marginally relevant evidence if it will distract the jury from the issue in this case." *(Shawn) Smith v. United States*, 180 A.3d 45, 60 n.50 (D.C. 2018) (quoting *Hager v. United States*, 791 A.2d 911, 914 (D.C. 2002)).

Appellant relies heavily on *Longus v. United States*, 52 A.3d 836 (D.C. 2012), in claiming that the trial court violated his constitutional rights, but we do not find the comparison apt. *Longus* faulted the trial judge for "not permit[ting] questioning or evidence about the facts underlying the investigation into Detective Brown's actions in the Club U investigation or the potential sanctions he would face if found to have coached witnesses." 52 A.3d at 851. Here, however, the court was careful to allow exactly that kind of questioning; in fact, Judge McKenna conscientiously applied *Longus* when addressing the issue:

> I think what *Longus* has established is that it would be an undue restriction on the defense's right to cross-examine government witnesses under the Sixth Amendment to limit that inquiry solely to the fact that the officer is the subject of a pending investigation. But that defense counsel needs to be able to go further than that to also question the officer not only about the existence of the pending investigation, but also what the subject of the

pending investigation is in order for the jury to be able to make a meaningful determination about how the officer views the gravity of the situation, how strong the motivation to curry favor might be; and enable the jury to make sort of an informed appraisal of the witness' potential motives and bias.

Officer Minzak confirmed during cross-examination that: (1) the OPC investigation involved "approaching a vehicle for an alleged traffic violation, searching the car for a firearm and not finding a firearm"; (2) the investigation was for "harassment and excessive force"; (3) the investigation was pending at both the time of the stop in this case and at the time of trial; (4) the "victim states that he was ordered out of the vehicle and that he was injured by the officers"; (5) Officer Minzak could get demoted; (6) he could get fired; (7) he could face criminal charges; and (8) any criminal charges brought for injuring a civilian would be brought by the United States Attorney's Office, the same office on whose behalf he was testifying that day.[9]

_____

[9] While Officer Minzak was on the stand, cross-examination for bias was not limited to the use of force investigation. Appellant was also permitted to separately explore another pending OPC complaint about the GRU logo. The investigation alleged that the GRU logo, which featured "a skull and cross bones" with "a bullet hole through the center of the skull in between the eyes," "handcuffs," a gun, and the motto "vest up, one in the chamber," "promot[ed] a culture of violence." The defense was permitted to ask questions about that investigation, introduce a photograph of Officer Minzak posing with the logo, and

(continued…)

Defense counsel was thus permitted to explore on cross-examination why Officer Minzak might be biased, and further permitted to argue during closing that he was indeed biased. Counsel asserted that Minzak had "a motive to make this seem legit . . . like it was a legitimate practice to go upon that Corolla holding a gun" and that he "faces penalties . . . if he is found to have violated that other young man's rights," "giv[ing] him a reason to conceal key facts from his statements to you." After hearing the cross-examination and the argument built upon it, the jury was equipped to make a "*discriminating* appraisal of the witness's motives and bias." *Longus*, 52 A.3d at 851; *see also Lewis*, 10 A.3d at 653 ("If a defendant is permitted to elicit facts sufficient to enable defense counsel to argue to the jury that the witness is biased, there is no constitutional error.").

A second crucial difference is that the defendant in *Longus* was able to point to a demonstrably false statement made by the testifying officer, a discrete instance in which counsel sought additional cross-examination. 52 A.3d at 850. Counsel for Longus was nonetheless prevented from confronting the officer about that statement and forced to accept the dishonest answer, despite being able to proffer

_____

(…continued)
elicit testimony that another officer was wearing the logo during the stop and arrest of appellant.

that he had legitimate reasons to believe that the response, given under oath, was false. *See id.* at 853 ("Defense counsel's proffer in this case did not 'manufacture' allegations of bias out of thin air, but based the proposed bias questioning on an article in a flagship newspaper, which the prosecutor acknowledged was 'not inaccurate,' and the government's suspension and investigation of Detective Brown for witness coaching.") (citation omitted).

Here, appellant did not allege that any of Officer Minzak's statements about the OPC investigation were false. Instead, appellant now asserts that Officer Minzak was able to respond to questions with a "dismissive[]" tone, and complains that counsel "could not dispel the suggestion that the complaint was frivolous." We do not discern such a tone from Officer Minzak's testimony, and he did not characterize the complaint as frivolous at any point.[10] Appellant also did not make this argument to the trial court, which would have been better suited than this court to address any issue with Officer Minzak's tone.

_____

[10] Officer Minzak responded "yes," "yes ma'am," or "correct" to nearly every question defense counsel posed about the OPC investigation as he confirmed the existence of the investigation, possible sanctions, and the nature of the allegations. The only notable exception is a question regarding whether any officer had drawn his or her firearm during that traffic stop, to which Officer Minzak responded: "I did not personally pull my gun out. I do not recall seeing any other officers on that traffic stop pull their gun out based on what you are asking me."

But the more fundamental problem is appellant's failure to acknowledge that the right of cross-examination "does not mean 'cross-examination that is effective in whatever way, and to whatever extent, the defense might wish.'" *Hagans v. United States*, 96 A.3d 1, 31 (D.C. 2014) (quoting *Van Arsdall*, 475 U.S. at 679). Quoting from a Supreme Court decision, appellant claims that "defense counsel should have been permitted to expose to the jury the facts from which jurors, as the sole triers of fact and credibility, could appropriately draw inferences relating to the reliability of the witness." *Davis v. Alaska*, 415 U.S. 308, 318 (1974). But *Davis* was a case where defense counsel had been precluded from revealing that a key prosecution witness was on probation following a juvenile adjudication, a status that created a motive to curry favor with the government. Appellant has taken the Court's language in *Davis* out of context in asserting that, in this case, "[d]efense counsel should have been allowed to use evidence such as medical records or photographs of the [OPC] complainant's injuries, body camera footage, or witness statements to paint a complete picture of the gravity of Officer Minzak's situation and expose his bias in the face of his denials."

In other words, appellant asserts that, in order to expose Officer Minzak's motive to curry favor, he was entitled to try the merits of the OPC complaint.

Putting aside the issue of whether counsel had any of these items available for use in cross-examination,[11] neither *Davis* nor *Longus* endorses such an unfettered right of cross-examination. While we have made clear that "counsel must be permitted to present the nature and extent of the bias," *Longus*, 52 A.3d at 851, including by way of probative extrinsic evidence, "[t]he judge must retain full authority to prevent this sort of trial-within-a-trial." *(Shawn) Smith*, 180 A.3d at 61 n.55.

After the requirements of the Constitution have been satisfied, the scope of cross-examination must be balanced against other interests, and the trial court "has discretion to impose reasonable limits." *See Hagans*, 96 A.3d at 31 (post-*Longus* decision holding that, when the trial judge permitted cross-examination for bias demonstrating that a cooperating witness had received a plea bargain, but precluded counsel from eliciting that the bargain allowed the witness to "escape[]

_____

[11] Though appellant often references the trial court's protective order and its prohibition on conducting an independent investigation into the facts underlying the OPC complaint, he does not make a freestanding argument that the order was issued in error. He relies instead on *Longus* and *Newman v. United States*, 705 A.2d 246 (D.C. 1997), for the proposition that it is error to preclude questioning or the introduction of evidence. However, counsel in those cases had the evidence readily available, while counsel in this case did not.

Similar to *Longus*, *Newman* is distinguishable because it involved: (1) the complete preclusion of defense counsel's ability to demonstrate bias, and (2) a specific, discernible allegation that the officer was testifying falsely alongside a detailed proffer about what a defense witness, who was present in the courtroom, could testify to in order to demonstrate the falsity.

being charged with two murders," "the limitation . . . did not prevent [appellant] from 'meaningfully' cross-examining" the witness).  The trial court did not abuse its discretion here.

## III.   Conclusion

The trial court did not abuse its discretion in declining to give a missing evidence instruction or in limiting cross-examination of Officer Minzak.  The judgment of the Superior Court is

*Affirmed.*