Michael A. LONGUS, Appellant,

v.

UNITED STATES, Appellee.

Nos. 05–CF–792, 07–CO–1288.

District of Columbia Court of Appeals.

Argued Dec. 16, 2009.
Decided Sept. 20, 2012.

Shilpa S. Satoskar, Public Defender Service, with whom James Klein, Samia Fam and Lee R. Goebes, Public Defender Service, were on the brief for appellant.

Ann K.H. Simon, Assistant United States Attorney, with whom Jeffrey A. Taylor and Roy W. McLeese III, United States Attorney and Assistant United States Attorney, respectively, at the time the brief was filed, and Elizabeth Trosman, Charles W. Cobb, and Joan Draper, Assistant United States Attorneys, were on the brief, for appellee United States.

Before GLICKMAN, Associate Judge, and FARRELL and RUIZ,* Senior Judges.

* Judge Ruiz was an Associate Judge of the court at the time of argument. Her status changed to Senior Judge on July 2, 2012.

RUIZ, Senior Judge:

Michael Longus was convicted of armed second-degree murder[1] and possession of a firearm during a crime of violence (PFCV)[2] in connection with the drive-by shooting of Maurice Brown. On appeal, he argues that his due process rights under the Fifth Amendment were violated when the government failed to correct the false statement of a detective who corroborated the testimony of a key witness in the case; and that his Sixth Amendment right to confront adverse witnesses was violated by improper limitations on defense counsel's examination of the detective for corruption and bias. Although we do not come to a final resolution of appellant's Fifth Amendment claim, we conclude that his Sixth Amendment right to confrontation was violated and that his defense was prejudiced as a result. We therefore reverse and remand for a new trial.

## I. STATEMENT OF THE FACTS

*The Government's Case*

In the early morning hours of June 5, 2003, Maurice Brown was walking across Foote Street near 60th Street, N.E., when he was killed by shots fired from a blue truck. At trial, the government presented two eye-witnesses, Chandra Cooley–Hinton and Shannon Scott. Cooley–Hinton testified that she was sitting in a parked car getting ready to smoke cocaine when she saw a person dressed in black (Maurice Brown) walk from the 5900 block of Foote Street towards Eastern Avenue and, "as he was crossing the street[,] the truck came by and some shots were fired and he got killed."[3] Scott testified that she was smoking "crack" and "out there prostituting" when she observed a blue Bronco truck come down the 60th Street hill, turn onto Foote Street, and stop in front of a

man dressed in a black coat with a hood, who was "shot a couple of times" and then fell to the ground. Both women testified that appellant ("Mike") was driving the truck when multiple shots were fired through the open passenger side window at Brown, who then collapsed. They disagreed on the number of persons in the truck and who fired the shots. Scott testified that appellant was the only person in the truck and that he had reached across the passenger seat of the truck and fired the shots at Brown. Cooley–Hinton testified that there were two people in the truck, that appellant was driving but did not fire the shots, and that the passenger, whom she saw but could not identify, fired the shots that killed Brown. Both Scott and Cooley–Hinton agreed that after the shots were fired, appellant sped off in the direction of 58th Street, N.E.

Scott and Cooley–Hinton testified that they each separately had a conversation with appellant that same day or the day after, June 6, 2003, regarding the murder. Scott had seen appellant standing at his "regular corner," on 60th Street and Eads Street, N.E., one block from where Brown was shot Appellant had approached Scott to ask if she knew what had happened "down there." Initially, Scott said, she demurred, but then told appellant "that [she] had heard he had shot this man, did something to this man in the street." She testified that appellant did not deny shooting Brown, and said that the man "shouldn't have been up here robbing people." Cooley–Hinton testified that she also spoke with appellant at the intersection of 60th Street and Eads Street, N.E., where she saw appellant sitting in the blue truck; she got into his truck, and asked why "would you do that on our street and

---

1. D.C.Code § 22–2103, –4502 (2001).

2. D.C.Code § 22–4504(b) (2001).

3. Cooley–Hinton testified that the truck was blue and silver.

make it hot around here?" Cooley–Hinton recalled that appellant responded by saying he had "fucked up" and that "[Brown] shouldn't have fucked with my shit." The day after the shooting, Cooley–Hinton was arrested by the Metropolitan Police Department (MPD) and taken to the 6th District police station.[4] While at the police station, Cooley–Hinton volunteered that she had information about the Foote Street, N.E. homicide. She was interviewed by MPD Detective Eric Brown. The official police report taken of the interview by Detective Brown was entered into evidence by defense counsel at appellant's trial, and is described below.

There was no physical or forensic evidence that linked appellant to the shooting of Maurice Brown. Based on Scott's and Cooley–Hinton's testimony about their conversations with appellant, the government argued that appellant killed Brown because Brown had robbed him.

*The Defense's Case*

Appellant's defense was that he had nothing to do with the shooting of Maurice Brown. The defense called four witnesses at his trial, Veria Brickhouse, Shirletta "Cheryl" Lewis, defense investigator Faheemah Davillier, and Detective Brown. Brickhouse lived in the building located in front of where the shooting took place; she testified that on the morning of June 5, 2003, she had heard gunshots outside as she was walking from her bedroom towards her living room. After she lay on the floor for about a half a minute for protection, she looked out of her window and saw a "boy" lying on his stomach on the ground in front of her apartment building. She then saw " 'L' ... one of the boys [from] around her neighborhood" drive down 60th Street and turn west onto Foote Street, stop beside the man on the

ground and yell up to Brickhouse to call the police. Brickhouse testified that two to three minutes later, appellant ("Mike") and an unknown companion approached on foot, from the west. Appellant spoke with "L," turned around and walked east on Foote Street, crossed Eastern Avenue, to where his truck was parked. Appellant started his truck, returned to pick up "L," and drove off.

Two of appellant's witnesses offered testimony intended to impeach Shannon Scott's testimony that appellant had fired the shots that killed Brown. Shirletta Lewis testified that she and Scott were in an alleyway near the scene at the time of the murder, that they had heard gunshots, two at first and then three more, and then "heard a truck pull off." According to Lewis, Scott left and Lewis stayed in the alleyway. In contrast to Scott, Lewis testified that she and Scott were sitting in some bushes in the alley when the shots were fired, and that Lewis was unable to see what transpired from that location. Defense investigator Davillier testified that she had measured the distance between the location in the alley where Scott and Lewis had been and the place on the street where Brown was shot. From that distance—one-hundred and ninety feet and four inches—the investigator was unable to see or describe persons in vehicles driving on Foote Street.

MPD Detective Brown was called by the defense to impeach the testimony of Cooley–Hinton based on the Detective's written report of the statement she had given to Detective Brown on June 6, 2003, the day after Maurice Brown was killed. That report described a shooting that was starkly different from the one Cooley–Hinton said she saw when she testified at appel-

4. Detective Brown testified that Cooley–Hinton was arrested on June 6, 2003, for solicitation for lewd and immoral purposes, but Cooley–Hinton testified that she was arrested for possession of cocaine and drug paraphernalia.

lant's trial that appellant ("Mike") had driven by in a blue truck and the passenger had fired the shots that killed Maurice Brown. Detective Brown's report of his interview with Cooley–Hinton on June 6, however, recorded that she saw Maurice Brown "in some type of transaction" with a person who goes by the nickname "L" and identified "L" as the shooter.[5] According to the Detective's report, Cooley–Hinton said that "L" had "walked up on [Maurice Brown] and sho[ ]t [him] three times and fled the scene in an unknown direction." When confronted with Detective Brown's report at trial, Cooley–Hinton contradicted the statement attributed to her in Detective Brown's report. Instead, she testified, she had not identified the shooter as "L" when she spoke with Detective Brown two years earlier and she never said that someone had "walked up," shot the victim, and fled on foot. Rather, Cooley–Hinton maintained, she had told detectives from the beginning that "Mike" (appellant) drove up in a blue truck and that it was the passenger in the truck who had fired the shots. Detective Brown testified at trial that Cooley–Hinton had identified "L" as the shooter, and never mentioned "Mike" or a truck as involved in the shooting. This was consistent with his report, which did not include any mention of appellant or a truck involved in the shooting. Detective Brown deviated from his written report, however, when he confirmed at trial that Cooley–Hinton had said "L" "drove up"—not that he had "walked up"—and dismissed this inconsistency between his report and the Cooley–Hinton's trial testimony as a "typographical error."

Faced with Detective Brown's testimony disowning part of his own report, which corroborated Cooley–Hinton's changed story that the shots came from a truck driven by appellant, defense counsel attempted to impeach Detective Brown by questioning him for bias as a hostile witness. The examination centered on a government investigation of allegations that Detective Brown and other officers had coached witnesses to change their stories about a homicide at "Club U."[6] Alerted by a February 25, 2005 article that appeared in *The Washington Post*[7] shortly before appellant's trial was scheduled to begin, defense counsel had filed a pre-trial request for *Brady*[8] material at a motions hearing on February 28, 2005. The article reported that "one or more witnesses" had changed their stories concerning the murder weapon after having been interviewed by the officers. The motion requested the names and addresses of the witnesses interviewed by Detective Brown in the Club U homicide investigation, their various statements to the prosecutors, the substance of the allegations against Detective Brown, the current state of the investiga-

5. Detective Brown's report contains a detailed description of "L": a "B/M [black male] about the age of 25 to 30 years old, dark complexion, 5'6", 160 lbs, brn eyes, short haircut, wearing grey T-shirt and black jeans." Detective Brown's report says Cooley–Hinton said that "L hangs out on Dix Street, and drives some type of blue truck and has a white girlfriend." The witnesses at trial said that appellant is not "L." Scott testified that appellant did not go by the nickname of "L," and that appellant "know[s]" and "hangs out with 'L.' " Brickhouse, the neighbor, also testified that appellant and "L" were not the same person. According to the indict-

ment, appellant was known as "Michael," "Michael Ebb," and "Knowledge."

6. The "Club U homicide" refers to the stabbing death of Terrance Brown on February 13, 2005, prosecuted in the case of *United States v. Jerome Jones*, D.C. Sup.Ct.2005–FEL–6847.

7. Henri E. Cauvin & Del Quentin Wilber, *Detectives Pulled Off Club U Slaying Case*, Wash. Post, February 25, 2005, at B2.

8. *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).

tion into the allegations of police misconduct, and the potential sanctions Detective Brown would face should the allegations be proven true. Defense counsel argued, "I think it would be relevant to [ ] his behavior in this case, that is the similarity between the information in this case as well as when compared to the U Street nightclub case ... [and] I would think we are positively entitled to this information, especially with bias cross-examination, intrinsic evidence can be introduced. If he were to deny having the bias, ... we can prove it ... with intrinsic evidence."[9] The trial court asked the government if the article in *The Washington Post* was accurate and the government responded, "It's not inaccurate ... [Detective Brown is] under investigation. Defense counsel made clear that was not enough, stating "we are entitled to the witnesses and the witnesses' statements so that we can, if necessary, show the jury, prove to the jury that [Detective Brown] does have a reason to testify falsely at this trial."[10] When defense counsel tried to impeach Detective Brown at trial, the trial court denied defense counsel's requests, agreeing with the prosecutor's position that:

> **Prosecutor:** [W]e think the only thing he's entitled to would be to ask the question are you not being investigated for coaching and having witnesses

change their story, that's it. I don't think you can get into whether or not he did or did not do it. It's like any other matter and it goes to his credibility.

. . .

[O]therwise we would start allowing the defense to go on a fishing expedition in another unrelated homicide case that we could take two weeks to try that part of it as to whether or not Detective Brown did or did not.

So limited, defense counsel asked Detective Brown about the pending investigation. Detective Brown acknowledged that he was being investigated by the U.S. Attorney's Office, and that he had been suspended from the police department. Detective Brown, however, deflected the suggestion that he had coached the witness in the Club U investigation to conform her testimony to the other evidence and denied that the witness had in fact changed her description of the murder weapon to conform to the physical evidence in the case:

> **Q.** In any case you were told that the information that the witness provided to you was not consistent with the known kind of physical evidence in the case, correct?
>
> **A.** Correct.

9. We cannot determine whether defense counsel said "intrinsic" rather than "extrinsic" evidence, or whether there is an error in the transcript. On appeal, both parties appear to agree that defense counsel was proposing to impeach Detective Brown by using the evidence about the Club U investigation that counsel claimed he was entitled to receive under *Brady*.

10. At this point in the pretrial hearing, the judge raised with counsel the possibility that a stipulation could be entered into regarding the identity of the witnesses and that the witnesses had "made statement A and thereafter made statement B." In response, the government said it was "pretty sure" it would

enter into such a stipulation, but it could "not commit" because it did not "know what is going on" in Detective Brown's investigation at that time. Defense counsel stated that the stipulation would not be sufficient because "it doesn't address anything about the detective's behavior." In response, the trial judge said she was "sure there is language that can be stipulated to or the government would be directed to provide the material." At trial a week later, the government stated it would enter into a stipulation that Detective Brown was suspended and under investigation for witness coaching, but would not agree to the stipulation proposed by the judge concerning the change in the witnesses' story.

Q. And you went back out and re-interviewed the witness, right?

A. Correct.

Q. And then you came back with information to the government that the witness had now changed, the witness had changed the story, correct?

A. Never had changed its story, no.

Q. What had the witness done?

. . .

A. Well, the witness just explained this at the time when she witnessed the stabbing she was not sure if it was a certain object or not.

Q. In any case the U.S. Attorney, you have come to understand that the U.S. Attorney involved in that prosecution has interviewed the witness that you interviewed, correct?

A. I'm not sure.

Q. You are not sure. Essentially the reason you are under suspension is because it's alleged that [in the Club U] case that you coached a witness to provide untruthful information, correct?

A. Yes, by the U.S. Attorney, yes.

After the defense's truncated examination of Detective Brown concerning the Club U investigation, the government presented MPD Detective Blackwell as a rebuttal witness to rehabilitate Detective Brown regarding the substantial divergence between Detective Brown's police report of the initial interview with Cooley–Hinton and her in-court testimony in this case, in particular, "to show that the [original] statement was consistent in [certain respects]." The prosecutor argued that rebuttal was necessary because the defense had "spent a great deal of time with [Detective] Brown on his statement ... concerning about walking up instead of riding up" and that Detective Blackwell's rebuttal would "go[ ] to rehabilitate [Detective] Brown." Over defense counsel's hearsay objection, the court allowed Detective Blackwell to testify that Cooley–Hinton, at some unidentified time, had said that appellant shot Maurice Brown, that appellant drove a blue truck on the date of the shooting.[11] Even Detective Blackwell's rehabilitation was at odds with Cooley–Hinton's trial testimony as she testified that appellant drove the truck but it was the passenger (whom she could not see) who fired the shots. Notwithstanding the witnesses' testimony that "L" and appellant were not the same person, the prosecutor argued that appellant was "L."[12]

On March 11, 2005, the jury acquitted appellant of first-degree murder and carrying a pistol without a license (CPWL), but convicted him of second-degree murder and PFCV. The trial court sentenced appellant to concurrent sentences of 300 months of incarceration plus five years of supervised release on the second-degree murder conviction, and ninety-six months of incarceration plus three years of supervised release on the PFCV conviction. Appellant filed a timely notice of appeal.

After appellant was convicted, defense counsel became aware of additional information about the government's investiga-

11. Detective Blackwell also said that the had "determine[d] during the investigation that appellant had a white girlfriend." The jury was instructed the following day to disregard Detective Blackwell's testimony that appellant had a Caucasian girlfriend because the detective did not have first-hand knowledge of this information.

12. In rebuttal, the prosecutor argued:

But who is L? L is Michael Longus, the only person [Cooley–Hinton] identified, the one who drives the blue truck and the one who has the white girlfriend and whether he walked up or drove up or did whatever, it wasn't nobody that shot that young man, Maurice Brown.... The only person who had a motive to go out and do this ... was [appellant].

tion into police misconduct in the Club U investigation. Defense counsel learned that as of March 9, 2005, the day that Detective Brown testified in appellant's trial, witnesses had informed the government that a mere three weeks earlier (February 14) they had changed their accounts of the Club U homicide under pressure from Detective Brown.[13] In addition, only a few days before Detective Brown testified at appellant's trial, one witness had testified at the grand jury proceeding in the prosecution of Jerome Jones for the Club U murder that she had changed her account to describe a "swinging" motion rather than a stabbing motion at the suggestion of Detective Brown. Another witness had testified at the Jerome Jones grand jury that Detective Brown asked her to change her story regarding the type of weapon used in the Club U homicide, specifically, that it was "silver," as opposed to describing it as a box cutter, because that "didn't support the evidence." [14]

On February 6, 2007, appellant filed a Motion for Relief pursuant to D.C.Code § 23–110. In his post-conviction motion appellant argued that the government violated his due process rights when it allowed Detective Brown's false testimony— that a Club U witness had not changed her story about the murder weapon—to stand uncorrected before the jury, and that the court's limitations on examination of De-

tective Brown violated his right to confront witnesses presented against him. The trial court denied appellant's motion, explaining that evidence about the Club U investigation and witnesses was "collateral" to appellant's case because it related to Detective Brown's conduct "in an unrelated homicide with different witnesses at a different location and time." Evidence of witness coaching by Detective Brown in the Club U case, the court held, was not "corruption evidence" admissible to show bias, and was inadmissible evidence of Detective Brown's prior bad acts. The court further noted that appellant had been able to expose Detective Brown's bias by reference to the pending investigation by the U.S. Attorney for witness coaching in the Club U investigation. Appellant filed a timely notice of appeal of the trial court's denial of the § 23–110 motion. We consolidated the direct appeal and the appeal of the denial of the post-conviction motion for new trial.

## II. The Government's Due Process Obligation to Correct False Testimony

A bedrock principle of due process in a criminal trial is that the government may neither adduce or use false testimony nor allow testimony known to be false to stand uncorrected. *See Napue v. People of State of Ill.*, 360 U.S. 264, 269, 79 S.Ct. 1173, 3 L.Ed.2d 1217 (1959); *Giglio v.*

---

13. On February 15 the witnesses informed the Assistant United States Attorney who was investigating the Club U murder. The witnesses' revelations so concerned the AUSA that two days later she informed the MPD Office of Internal Affairs (OIA) in the Office of Professional Responsibility of the allegations that these witnesses had been convinced by Detective Brown "to change their statements to corroborate forensic evidence." "[G]iven the nature of the allegation and the seriousness of the charges," the OIA directed Lieutenant William Farr of the Office of Superintendent of Detectives to place Detective Brown in "Non–Contact Duty" status.

14. A third witness's testimony before the grand jury consistent with her original statement to Detective Brown and the witness then said that no one had "suggest[ed] to [her] what [she] should say." However, this witness recanted nine months later; she testified at the Jerome Jones probable cause and detention hearing that Detective Brown and his partner, Detective Morales, had told her to say that the weapon used was a "shiny, metal object" rather than a "box cutter" as she had originally described it.

*United States*, 405 U.S. 150, 153, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972); *Bruce v. United States*, 617 A.2d 986, 992 (D.C.1992); *Hawthorne v. United States*, 504 A.2d 580, 591 (D.C.1986).

▆▆▆▆ *Napue* claims are reviewed de novo and, under this standard, we must conclude that appellant's due process rights were violated necessitating a new trial if: (1) the government knew (or should have known) that testimony proffered by Detective Brown was false, but failed either to correct the falsehood before the jury or to apprise the court and defense counsel about Detective Brown's false testimony in a manner that would have allowed it to be corrected before the jury; and (2) the government cannot show, beyond a reasonable doubt, that the false testimony was harmless in the context of appellant's trial. *See Napue*, 360 U.S. at 271–72, 79 S.Ct. 1173 (noting that "[we] make [our] own independent examination of the record," including "re-examin[ing] the evidentiary bases" for the trial court's determination); *United States v. Bagley*, 473 U.S. 667, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985) (holding that the *Napue* standard is equivalent to that applicable to constitutional errors under *Chapman v. California*, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967)); *Jenkins v. Artuz*, 294 F.3d 284, 294–95 (2d Cir.2002); *United States v. O'Keefe*, 128 F.3d 885, 894 (5th Cir.1997). The government argues, however, that in this case we should review for abuse of discretion because appellant's *Napue* claim was made in the context of a post-conviction motion for new trial. *See O'Brien v. United States*, 962 A.2d 282,

314 (D.C.2008) (stating in the context of a Rule 33 motion for new trial raising a *Napue* claim, "[t]his court reviews a decision to deny a motion for new trial for abuse of discretion" (internal quotation and citation omitted)). We note that defense counsel did not learn, until after trial, the details of what the government knew about the changed stories of the Club U witnesses because the government resisted turning over the evidence requested as part of appellant's *Brady* request. Thus, counsel could not have raised the *Napue* claim on direct appeal. In any event, the disposition of this appeal does not turn on the difference in the standard of review. Regardless of whether the *Napue* claim was presented in the context of a new trial motion entrusted to the trial court's discretion, the court commits legal error (and thus abuses discretion) if its ruling is based on incorrect legal principles. *See Johnson v. United States*, 398 A.2d 354, 363–64 (D.C.1979). Here, the trial court did not apply *Napue* principles in denying the motion, but instead reasoned (incorrectly) that evidence of the Club U investigation would be "a time-consuming and confusing sub-trial on a collateral matter." [15]

The government contends that we need not address appellant's due process claim at all, arguing that the government's obligation under *Napue* applies only when statements are elicited by the prosecutor from a government witness. Thus, the government argues, appellant's claim must fail since it was defense counsel who called Detective Brown and elicited the testimony appellant claims was false.[16]

---

15. The trial court did not specifically address appellant's *Napue* claim, but appears to have been responding to a *Brady* argument. On appeal, appellant does not press his *Brady* claim; the government does not contend that the *Napue* claim is not preserved.

16. Neither party cites a controlling case. The government relies on *O'Brien*, 962 A.2d at 315, and *Bruce v. United States*, 617 A.2d 986 (D.C.1992). But neither of these cases decided the question before us. *O'Brien* was decided on the basis that the trial judge did not clearly err in finding that the witness's testimony had not been "perjured" or "knowingly

We think this is too narrow a reading of the cases in light of the constitutional basis and purpose of the obligation. *Giglio* itself involved a false statement elicited by defense counsel's cross examination of a government witness. 405 U.S. at 151–52, 92 S.Ct. 763. Our cases applying *Napue* have arisen in similar circumstances, where the false statement is elicited during defense cross-examination. *See, e.g., Woodall v. United States*, 842 A.2d 690, 694–96 (D.C.2004); *McNeil v. United States*, 465 A.2d 807, 810 (D.C.1983). And even though (not surprisingly) reported cases involve government witnesses, it is illogical and contrary to principles of due process to conclude that the government is freed from any obligation simply because the false testimony is presented in response to defense questioning of a witness it called. The Supreme Court has made clear that "a conviction obtained through use of false evidence, known to be such by representatives of the State, must fall under the Fourteenth Amendment," *Napue*, 360 U.S. at 269, 79 S.Ct. 1173, and "the same result obtains when the State, *although not soliciting false evidence,* allows it to go uncorrected when it appears." *Id.* (emphasis added). Therefore, we have said, "[a] prosecutor may not knowingly present false evidence *or permit evidence known to be false,* to go uncorrected." *Hawthorne,* 504 A.2d at 589 (emphasis added).

■ Moreover, the government's obligation is not limited to the correction of false evidence presented in its case-in-chief, but extends to evidence that pertains to impeachment:

> The principle ... does not cease to apply merely because the false testimony goes only to the credibility of the witness. The jury's estimate of the truthfulness and reliability of a given witness may well be determinative of guilt or innocence, and it is upon such subtle factors as the possible interest of the witness in testifying falsely that a defendant's life or liberty may depend.

*Napue,* 360 U.S. at 269, 79 S.Ct. 1173. Thus, "when the 'reliability of a given witness may be determinative of guilt or innocence,' nondisclosure of evidence affecting credibility falls within this general rule." *Giglio,* 405 U.S. at 154, 92 S.Ct. 763 (internal quotation and citation omitted).[17]

Our conclusion that a *Napue* claim does not depend on whether the government calls and questions the witness is supported by the Supreme Court's grounding

---

false." 962 A.2d at 315–16. *O'Brien's* statement that *Napue* requires that the prosecutor have "presented" false testimony relies on *Card v. United States,* 776 A.2d 581, 602 (D.C. 2001), an opinion this court has vacated. *Card v. United States,* 863 A.2d 821 (D.C.2004) (per curiam). *Bruce* was decided on the basis that, unlike in *Napue* and *Giglio,* the defense and the court were aware that the witness had testified falsely. 617 A.2d at 993. *See also Gatlin v. United States,* 925 A.2d 594, 603–04 (D.C.2007) (prosecutor did not "present false evidence" where witness "unexpectedly" made statement during defense cross-examination, the prosecutor immediately explained that although the witness had made the same statement to him, witness had not made similar false statement in five previous court appearances, and further cross-examination and testimony by another witness exposed the falsity of the statement).

Appellant relies on *Commonwealth v. Jenkins,* 1981 WL 180482 (Va.Cir.1981) ("[I]f the prosecution has a duty to come forth with earlier inconsistent testimony, the [c]ourt does not believe it would matter which party had put the witness on.").

17. In *Napue,* the principal state witness, who had pled guilty and was serving a 199–year sentence for the same murder charged against the defendant, falsely testified that he did not have a promise from the government that he would receive favorable treatment in return for his testimony. In fact the government had made such promises and the prosecutor did nothing to correct this false testimony. *See* 306 U.S. at 264–65, 59 S.Ct. 490.

of *Napue* and *Giglio* on the Due Process Clause, for which "the touchstone ... is the fairness of the trial." *Smith v. Phillips*, 455 U.S. 209, 219, 102 S.Ct. 940, 71 L.Ed.2d 78 (1982). In *Giglio*, after citing *Brady's* indifference to the "good faith or bad faith of the prosecution," 405 U.S. at 153, 92 S.Ct. 763, the Court noted that "whether the nondisclosure was a result of negligence or design, it is the responsibility of the prosecutor," *id.* at 154, 92 S.Ct. 763 and "the jury was entitled to know of it." *Id.* at 155, 92 S.Ct. 763. Thus, as we noted in *Woodall*, 842 A.2d at 697, the "underlying purpose of *Napue* and *Giglio* is not to punish the prosecutor for the misdeeds of a witness, but to ensure [the] jury is not misled by falsehoods." (internal quotation and citations omitted). To achieve that purpose, the guarantee of the Due Process Clause must extend beyond proscribing only affirmative prosecutorial misconduct in the form of sponsoring false testimony, and requires, in the interest of a fair trial, that the prosecutor take steps to correct false testimony that the jury could use in deciding to convict. Where only the government knows that the witness's statement is false, only the prosecutor can take steps to ensure the jury is not misled, either by correcting the falsehood before the jury or by disclosing the falsehood to the court and defense counsel and not objecting to defense counsel's efforts to correct the record. *See Woodall*, 842 A.2d at 697 (noting that prosecutor "fell short" by objecting to defense counsel's attempts to correct witness's false statement). A different conclusion would create perverse incentives and permit the government to benefit from false testimony, especially when the source of the false testimony is a police officer who is likely to be perceived by the jury as naturally aligned with the government's case, even if he is called by the defense.[18] Here, for example, although the prosecutor did not call Detective Brown, or elicit a false statement, the prosecutor made use of Detective Brown's testimony in closing argument, as corroboration of Cooley–Hinton's trial testimony that she had always said appellant drove the truck used in the drive-by shooting.[19]

It is well established that the government's obligation extends to the

18. As appellant argues, in a situation like this, where the government "is faced with a witness who is potentially troubling, but nonetheless important (like Detective Brown), the government can simply choose to forgo calling the witness in its case (as it did here), secure in the knowledge that when the defense called the witness, the government would have no *Napue* obligations should this witness testify in a false or misleading manner."

19. The prosecutor argued in closing:
Now the defense is going to say, well, Chandra Cooley[-Hinton] initially spoke to [Detective] Eric Brown and they are going to talk about the notes, when he talked about when Eric Brown interviewed ... Chandra Cooley[-Hinton] on June of 2003, and he said, well, L walked up and shot him, and as ... Detective Eric Brown told you, in October of 2003, he corrected it during a hearing when he said, L drove up.

In response, defense counsel argued in closing that jurors should credit Cooley Hinton's initial version as contained in the police report "because it's just common sense, a detective, an experienced detective is going to get it right." Counsel then added:
Whether [Detective Brown] will tell you that he got it right as the case goes on is a different question ... and this detective, as you know is under investigation for allegedly hanky-pankying with witnesses and you know what he wrote down ... based on what Chandra [Cooley–Hinton] told him that first time is not at all [like] what she comes up with on this witness stand and what she came up with later on. L walks up and shoots the guy. There it is. Even L drove up and shoots the guy, that's still different than what she says here. It's still L. You can't make L go away. There it is.

correction of not only perjurious testimony,[20] but also to testimony that is "false," *Hawthorne,* 504 A.2d at 589, or "misleading," *Felder v. United States,* 595 A.2d 974, 977 n. 8 (D.C.1991). Thus, it does not matter whether the witness thought he was telling the truth, so long as the government knew it was not so. *See Thompson v. United States,* 45 A.3d 688, 691 n. 4 (D.C.2012) ("It is well recognized that the government's obligation to correct 'false' testimony also applies to mistaken testimony." (citing *United States v. McClintic,* 570 F.2d 685, 692 n. 13 (8th Cir.1978) (noting that "when the witness's answer, although made in good faith, is untrue, the Government's obligation to correct that statement is as compelling as it is in a situation where the Government knows that the witness is intentionally committing perjury"))). And, as with *Brady,* the government's obligation under *Napue* turns not on the personal knowledge of an individual prosecutor, but on what the "government," under a collective knowledge theory, knew or should have known.[21] *See Giglio,* 405 U.S. at 153–54, 92 S.Ct. 763 (holding that government had obligation to correct the record even though trial prosecutor believed that witness was telling the truth when he denied having been made any

promises, when promise of immunity in fact had been made by another prosecutor at an earlier stage of proceeding); 6 WAYNE R. LAFAVE ET AL., CRIMINAL PROCEDURE § 24.3(d) (3d ed.2007).

Having established these basic legal principles, we turn to the facts of this case. In his testimony, Detective Brown acknowledged in response to defense counsel's questioning that he had been placed on suspension because he was under investigation by the U.S. Attorney's Office for coaching witnesses in the Club U investigation. Appellant's argument is that the prosecutor should have corrected the record when Detective Brown when he testified that the witness in the Club U Case "never had changed it's story, no." There is no doubt that the government, collectively, knew that the witness had changed her story.[22] But so, it would appear, did the defense, as the allegations of witness coaching had been reported in the *Washington Post* article and had been the subject of pretrial discussion with the judge in connection with the defense's *Brady* request for additional information concerning Detective Brown's alleged coaching. Moreover, there is a question whether the record needed correcting. Detective Brown added a qualification to his denial that the witness had changed her story, saying that she "wasn't sure."[23] Even if

---

**20.** Perjury is a "willful assertion as to a matter of fact, opinion, belief, or knowledge" made by a witness under oath that is "material to the issue or point of inquiry and known to such witness to be false." *Brooks v. United States,* 396 A.2d 200, 205 (D.C.1978).

**21.** The AUSA investigating the Club U murder was not the prosecutor in appellant's trial; the record is unclear as to how much the latter knew about the revelations made by the witnesses in the Club U investigation.

**22.** It is also clear that at the time of appellant's trial the government believed the Club U witnesses when they said that Detective Brown had coached them to change their story. The government presented the witnesses' testimony about the coaching to the

grand jury that indicted Jerome Jones with the Club U murder, used the witnesses' coaching allegations to bolster the reliability of their initial accusations against Jones before they were coached in opposing Jones's motion to dismiss the indictment, and eventually indicted Detective Brown for obstruction of justice in connection with the Club U investigation and prosecution of Jones. The AUSA who investigated the Club U murder testified at the detective's trial that "it was pretty blatant" from her conversations with the witnesses that they had changed their stories at the detective's suggestion

**23.** Detective Brown said that "the witness just explained this at the time when she witnessed the stabbing she was not sure if it was a certain object or not."

his denial and further explanation about what the witness said were not factual if viewed in isolation, the government makes a strong argument that, viewed in its entirety, Detective Brown's testimony conveyed to the jury the "true and fair impression that he maintained his innocence, and MPD and the United States were sufficiently concerned about his culpability to take the most forceful investigative actions available." In short, that from Detective Brown's acknowledgment that the was under investigation for witness coaching, the jury easily would have inferred that the witness had changed her story, but that Detective Brown claimed he was not the cause of her change of heart.

We need not decide whether the statement needed to be corrected, and if so, whether it was the government's responsibility to do so under the circumstances, because as we discuss in the next section, appellant is entitled to reversal and a new trial on a different ground that also relates to impeachment of Detective Brown's credibility. In light of our holding that the court unduly limited appellant's right to cross-examine the detective about whether he had coached witnesses in the Club U investigation to give false testimony, and because appellant is now in possession of all the information necessary to establish at a new trial that witnesses did change their testimony after being re-interviewed by Detective Brown, appellant will be able to present a factual record to the jury.[24]

## III. The Sixth Amendment Right to Confrontation

■ Appellant raises another claim that, although also related to the credibility of Detective Brown's testimony, has a different legal basis. He argues that his Sixth Amendment right to confront adverse witnesses was violated by the trial court's ruling imposing limitations that precluded him from conducting an adequate examination of Detective Brown for bias related to his "corrupt" behavior in the Club [U] investigation. In this case, the trial court ruled that appellant could ask Detective Brown whether he was under investigation for coaching a witness to provide untruthful information, but that defense counsel could neither question the detective about, nor introduce evidence of, the facts underlying the allegations. We conclude that appellant's right to confront Detective Brown by exposing his various biases was violated by the limitations imposed on cross-examination and introduction of evidence about the detective's involvement in witness coaching in the Club U investigation.

■ The Sixth Amendment guarantees a defendant in a criminal case the right to confront witnesses "against him." U.S. CONST. amend. VI. As is the case with the government's obligation under the Fifth Amendment's Due Process Clause we have just discussed, it is immaterial under the Sixth Amendment whether the adverse witness has been called by the defense or the government, see *Chambers v. Mississippi*, 410 U.S. 284, 93 S.Ct. 1038, 35 L.Ed.2d 297 (1973),[25] so long as it is not a

24. There is a conceptual interplay between the defense's access to impeachment information and ability to conduct cross-examination and the government's *Napue* obligation. Where defense counsel has received the impeachment information to which it is entitled and is able through cross-examination to expose to the jury the facts relevant to a witness's credibility, the prosecutor's due process obligation to correct the record is not as acute, for "it [is] arguably appropriate for the

prosecutor to leave it to defense counsel to propose a way to protect the interests of his client." *Bruce*, 617 A.2d at 993. However, if defense counsel is unable to present evidence to correct false testimony—whether because of ignorance of the true facts or a judicial limitation—the government's *Napue* obligations come to the forefront.

25. "The availability of the right to confront and to cross-examine those who give damaging testimony against the accused has never

"mere subterfuge" to present otherwise inadmissible evidence. "The test is whether the [questioning party] exhibited bad faith by calling a witness sure to be unhelpful to its case." *Smith v. United States*, 26 A.3d 248, 263 (D.C.2011) (quoting *United States v. Kane*, 944 F.2d 1406, 1411 (7th Cir.1991)).

Here, the defense strategy to call Detective Brown to impeach Cooley–Hinton's testimony with her prior inconsistent statement to Detective Brown was reasonable and grounded on evidence in the record, the police report Detective Brown had written when he interviewed Cooley–Hinton. It was not a subterfuge, as impeaching Cooley–Hinton's trial testimony that appellant was the driver of the van from which the shots were fired, via her inconsistent initial report to Detective Brown (that a lone shooter other than appellant had "walked up"), would surely have been helpful to the defense. When Detective Brown retracted at trial what he had written in the report about Cooley–Hinton's initial statement to the police about the shooter having "walked up," it became necessary to confront him with respect to that retraction.

 The right to meaningful confrontation "means more than being allowed to confront the witness physically." *Davis v. Alaska*, 415 U.S. 308, 315, 94 S.Ct. 1105, 39 L.Ed.2d 347 (1974). As the Supreme Court has said:

> [A] criminal defendant states a violation of the Confrontation Clause by showing that he was prohibited from engaging in otherwise appropriate cross-examination

designed to show a prototypical form of bias on the part of the witness, and thereby to expose to the jury the fact from which jurors … could appropriately draw inferences relating to the reliability of the witness.

*Delaware v. Van Arsdall*, 475 U.S. 673, 680, 106 S.Ct. 1431, 89 L.Ed.2d 674 (1986) (quoting *Davis*, 415 U.S. at 318, 94 S.Ct. 1105). "Bias refers both to a witness' personal bias for or against a party and to his or her motive to lie." *McCloud v. United States*, 781 A.2d 744, 752 (D.C.2001) (internal quotation and citation omitted). "Bias is always a proper subject of cross-examination." *Brown v. United States*, 683 A.2d 118, 124 (1996) (quoting *Jones v. United States*, 516 A.2d 513, 517 (D.C. 1986)).[26]

 The Sixth Amendment right to confrontation is violated "only when the court precludes a 'meaningful degree of cross-examination.'" *Jordan v. United States*, 18 A.3d 703, 710 (D.C.2011) (quoting *Flores v. United States*, 698 A.2d 474, 479 (D.C.1997)). In determining what is "meaningful" cross-examination, we have been solicitous of a defendant's right to effectively expose a witness's various biases to the jury. Thus, we have said, "[t]o make cross-examination based upon witness bias effective (and thus satisfy the Sixth Amendment), defense counsel must be 'permitted to expose to the jury the facts from which jurors … could appropriately draw inferences relating to the reliability of the witness.'" *Lewis v. United States*, 10 A.3d 646, 654 (D.C.2010) (quoting *Davis*, 415 U.S. at 318, 94 S.Ct. 1105). A trial court ruling therefore in-

been held to depend on whether the witness was initially put on the stand by the accused or by the State. We reject the notion that a right of such substance in the criminal process may be governed by that technicality or by any narrow and unrealistic definition of the word 'against.'" *Chambers*, 410 U.S. at 297–98, 93 S.Ct. 1038.

26. "The term 'bias' is utilized by some authorities as a shorthand reference to all forms of partiality that may be proven by extrinsic evidence." *In re C.B.N.*, 499 A.2d at 1219 (citing *e.g.*, E. CLEARY, MCCORMICK ON EVIDENCE § 40 (3d ed.1984)).

fringes on the Sixth Amendment right to confrontation when it precludes the defense from pursuing a line of examination that is necessary to enable the jury to fully evaluate the witness's credibility. It is not enough that the possibility of bias be mentioned; counsel must be permitted to present the nature and extent of the bias. *See Davis*, 415 U.S. at 318, 94 S.Ct. 1105 (holding cross-examination on bias inadequate where "counsel was permitted to ask [a witness] *whether* he was biased" but "was unable to make a record from which to argue *why* [the witness] might have been biased" (emphasis added)); *Jenkins v. United States*, 617 A.2d 529, 532 (D.C. 1992) (holding cross-examination on witness's upcoming sentencing insufficient where defense was precluded from eliciting nature of the crime, because without knowledge of the severity of the potential sanction, the jury could not assess extent to which witness might be induced to "shade his trial testimony to curry the government's favor").

In this case, the defense sought to impeach Detective Brown for bias on two different grounds. One type of bias arose from the fact that Detective Brown was under investigation by the U.S. Attorney for witness coaching. This bias impeachment was permissible, as we recently held in connection with another detective also under investigation for witness coaching in the Club U murder investigation. *See Smith*, 26 A.3d at 262–63.[27] The fact that the detective was under investigation, we

said, provided a motive for the detective to want to curry favor with the government and resist admitting that the witness had changed her story in that investigation. *Id.* at 263. In appellant's case, the court did allow defense counsel to question Detective Brown about the fact that he was subject to government investigation into witness tampering, but did not permit questioning or evidence about the facts underlying the investigation into Detective Brown's actions in the Club U investigation or the potential sanctions he would face if found to have coached witnesses. As a result, although Detective Brown acknowledged he was being investigated for "allegations" of witness coaching, and had been suspended from police duty, counsel was unable to counter the detective's denial of the substance of the allegations when he falsely testified that the witness in the Club U investigation had not changed her story. This information would have shed light on how the detective viewed the gravity of his situation in light of the government's persistence in pursuing the allegations of witness coaching. The limitations on cross-examination thus prevented defense counsel from "elicit[ing] enough information to allow a *discriminating* appraisal of the witness's motives and bias." *United States v. Graham*, 83 F.3d 1466, 1474 (D.C.Cir.1996) (internal editing omitted and emphasis added); *see Martinez v. United States*, 982 A.2d 789, 796 (D.C. 2009) (cross-examination of police officer on his status as the subject of an internal

27. In *Smith*, the defense called MPD Detective Milagros Morales, who had investigated the Club U homicide along with Detective Brown. Defense counsel wanted to ask Detective Morales about the government's investigation into her alleged malfeasance in the Club U investigation "to expose to the jury [the detective's] potential bias." 26 A.3d at 263. Specifically, defense counsel wanted to show that Detective Morales wanted to curry favor with the government because she was under investigation for coaching witnesses in

the Club U homicide. *Id.* at 263. The trial court prohibited defense counsel from even mentioning the fact of an investigation into the detective's conduct, however, because counsel did not have evidence that Detective Morales had actually coached witnesses, and, it appeared to the trial court, counsel's only reason for calling Detective Morales was "to parade her as a dirty cop." *Id.* at 256. We held that the bias impeachment was proper and that the defense had proffered a sufficient foundation. *Id.* at 262–63.

investigation was insufficient where court precluded additional questioning on potential sanctions); *Jones v. United States*, 853 A.2d 146, 153 (D.C.2004) (preclusion of cross-examination on police officer's lack of compliance with internal regulations and failure to include exculpatory information in warrant affidavit violated Sixth Amendment despite admission of other evidence on these issues).

■ A trial court's "refusal to allow questioning about facts indicative of [a witness's] bias from which the jury could reasonably draw adverse inferences of reliability is an error of constitutional dimension." *Cunningham v. United States*, 974 A.2d 240, 245 (D.C.2009). Moreover, evidence from which the jury can infer bias may be presented not only through cross-examination, but also by the introduction of extrinsic evidence. *See In re C.B.N.*, 499 A.2d 1215, 1218 (D.C.1985) ("[T]he defendant may introduce extrinsic evidence to establish bias or prejudice because it is not a 'collateral issue.'" (quoting *Johnson v. United States*, 418 A.2d 136, 140 (D.C. 1980))). The trial court's ruling limiting counsel's examination of Detective Brown's bias related to the Club U investigation because it was deemed "collateral" therefore infringed on appellant's rights under the Sixth Amendment.

The defense had another theory for bias cross-examination. In addition to wanting to expose Detective Brown's motivation to curry favor with the government and avoid additional exposure in light of the pending investigation into witness coaching, counsel wished to show his "corruption" through evidence that Detective Brown had actually engaged in witness tampering in the Club U case. "Conduct of that sort, revealing a propensity or willingness to thwart the ascertainment of truth in a judicial proceeding, bears directly on the veracity of the wrongdoer in testifying at a trial." *Ben-*

*nett v. United States*, 763 A.2d 1117, 1123 (D.C.2000). This kind of "corruption evidence," we have held, is a distinct subset of bias evidence. *In re C.B.N.*, 499 A.2d at 1219 (noting that corruption evidence is a subset of bias evidence whose "essential discrediting element is a willingness to obstruct the discovery of the truth by manufacturing or suppressing testimony") (quoting 3A JOHN H. WIGMORE, EVIDENCE IN TRIALS AT COMMON LAW §§ 956–964 (Chadbourn ed. 1970)); *see also* 1 McCORMICK ON EVIDENCE § 39, at 174 (6th ed. 2006) ("Self-interest in an extreme form may be manifest in the witness's corrupt activity such as seeking to bribe another witness, taking or offering to take a bribe to testify falsely, or making similar baseless charges on other occasions."). Thus, the allowance of some examination for one type of bias (currying favor with the government) does not satisfy the Sixth Amendment with respect to cross-examination for corruption, a different type of bias. *See Davis*, 415 U.S. at 319, 94 S.Ct. 1105 (recognizing defendant was precluded from cross-examining witness about two different interests leading to bias: to shift suspicion from himself for the charged crime and to avoid revocation of probation in another case for failing to "cooperate"); *Jenkins*, 617 A.2d at 532 (noting that "even where the trial court has allowed counsel to explore at will the potential ulterior motives of a witness, yet refuses one potentially inflammatory area, an error has occurred").

■ The government argues that appellant did not elucidate the corruption theory of bias at trial and that the extrinsic evidence about the investigation into the Club U homicide necessary to prove it would have been collateral to the investigation in this case. As we have already discussed, to the extent that Detective Brown's witness coaching in the Club U investigation involved corruption, it was not "collateral," and extrinsic evidence

could be introduced to show such bias. *See Bennett,* 763 A.2d at 1124 (error to exclude evidence of an attempt to bribe witness in unrelated case); *In re C.B.N.,* 499 A.2d at 1219–20. We also reject the government's contention that appellant has not preserved his Sixth Amendment claim because counsel did not apprise the court of this specific theory of corruption bias impeachment. We disagree. Before trial, counsel had argued that as part of cross-examination for bias, he was entitled to present evidence of Detective Brown's alleged malfeasance in the Club U investigation because of "the similarity between the information in this case ... when compared to the U Street nightclub case...." The trial court rejected counsel's argument as raising a "collateral" issue. Counsel's proffer was enough to preserve the claim for appeal. When there is an objection to cross-examination, counsel must proffer to the court "the basis for her genuine belief that her questioning is well-grounded and hence that the answers may be probative of bias." *Clayborne v. United States,* 751 A.2d 956, 963 (D.C.2000). Defense counsel's proffer in this case did not "manufacture" allegations of bias out of thin air, *id.* at 962–63, but based the proposed bias questioning on an article in a flagship newspaper, which the prosecutor acknowledged was "not inaccurate," and the government's suspension and investigation of Detective Brown for witness coaching. Appellant may present a more fine-tuned argument on appeal, but that does not negate that his claim was adequately presented. Moreover, once defense counsel obtained additional facts about Detective Brown's role in the Club U investigation after trial, the corruption bias argument was fully fleshed out in the § 23–110 motion, which the trial court denied as well. That denial also is on appeal before us.

We are not persuaded by the government's argument that the trial court's ruling limiting bias examination can be explained as an exercise of the court's power to impose reasonable limitations on cross-examination. That discretion is properly exercised by imposing limitations designed to avoid jury confusion and witness harassment and to promote judicial efficiency, but it does not permit infringement on otherwise legitimate questioning by defense counsel to probe a witness's bias. We need not retreat from the "oft-repeated maxim that a trial court retains broad discretion to impose 'reasonable limits' on cross examination," to conclude that in this case the "broad discretion afforded to the trial court 'cannot ... justify a curtailment which keeps from the jury relevant and important facts bearing on the trustworthiness of crucial testimony.'" *Coles v. United States,* 808 A.2d 485, 492 (D.C.2002) (Ruiz, J., dissenting) (quoting *Bennett v. United States,* 797 A.2d 1251, 1257 (D.C.2002)).[28]

In short, the trial court's ruling was based on the erroneous belief that cross-examination about the fact of a pending investigation, without allowing defense counsel to probe into and present extrinsic evidence of the underlying facts, satisfied appellant's right under the Sixth Amendment to expose all of Detective Brown's potential biases relevant to his testimony in appellant's trial.[29] This cross-examination was probative. It would have permitted the jury reasonably to infer not only that Detective Brown was motivated to

---

**28.** Although our review of evidentiary rulings is deferential, "[t]he usual deference does not apply when a [trial] court incorrectly recognizes the nature of the evidence." *Bennett,* 763 A.2d at 1124 (quoting *United States v. Manske,* 186 F.3d 770, 776 (7th Cir.1999)).

**29.** The trial court also ruled that the evidence should not be admitted because it constituted evidence of Detective Brown's prior "bad acts." The government does not urge this rationale on appeal, but we wish to lay to rest any suggestion that "prior bad acts" of the

curry favor with the government because he was under criminal investigation, but also that he was not a trustworthy witness as shown by his prior corrupt behavior in the Club U homicide investigation. As in *Smith*, defense counsel "was entitled to impeach [the detective's] credibility with both the fact and the subject matter of the investigation." 26 A.3d at 263; *see Bennett*, 797 A.2d at 1257. And, as in *In re C.B.N.*, counsel should have been allowed to show that the witness was "corrupt" because of "a willingness to obstruct the discovery of the truth by manufacturing or suppressing testimony" and "a general willingness to lie upon the stand." 499 A.2d at 1219 (quoting 3A WIGMORE, *supra*, at § 956, at 803, and §§ 956–58). These biases could have led Detective Brown to lie at appellant's trial to recant his own report and deny that Cooley–Hinton had initially said to him the lone shooter "L" had "walked up." Impeaching the detective for bias, in turn, would have allowed the defense to impeach Cooley–Hinton, the government's principal witness against appellant, by confronting her with the inconsistent report she initially gave the police. The trial court's ruling, therefore, impeded appellant's Sixth Amendment right to confront both Detective Brown and Cooley–Hinton.

## IV. Prejudice

██ Having found that appellant's Sixth Amendment confrontation right was violated, we consider whether this violation was harmless applying the constitutional *Chapman* standard. *See In re C.B.N.*, 499 A.2d at 1221 (noting that "even if the court has permitted some cross-examination relevant to bias, we will evaluate the error under the harmless constitutional error test of *Chapman* "). Under *Chapman*, the government bears the burden of showing that the error was "harmless beyond a reasonable doubt." 386 U.S. at 24, 87 S.Ct. 824. After considering "the importance of the witness' testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and ... the overall strength of the prosecution's case," *Van Arsdall*, 475 U.S. at 684, 106 S.Ct. 1431, we conclude the government cannot meet this high burden.

It bears repeating that the ultimate objective of defense impeachment was Cooley–Hinton. She testified that although appellant did not shoot the victim, he drove the truck to where the victim was standing and then drove off after the passenger fired the shots. From the verdict, finding appellant guilty of second-degree murder and PFCV (but not CPWL), it appears her testimony carried the day with the jury.[30] Detective Brown was key

witness are not admissible in bias examination. *See Sherer v. United States*, 470 A.2d 732, 738 (D.C.1983) (explaining different grounds for impeachment with prior convictions and prior bad acts). Nor do the strictures on admission of "other crimes evidence" exemplified in *Drew v. United States*, 331 F.2d 85 (D.C.Cir.1964), apply to exclude relevant evidence used to impeach a witness *other than the defendant*. The question is whether the witness's prior bad acts "bear directly upon the veracity of the witness in respect to the issues involved [in] the trial."

*Jones v. United States*, 27 A.3d 1130, 1150 (D.C.2011); *Riddick v. United States*, 806 A.2d 631, 637–8 (D.C.2002); *Grayton v. United States*, 745 A.2d 274, 280 (D.C.2000); *Newman v. United States*, 705 A.2d 246, 255 (D.C. 1997). The requirement that a "prior bad act" have resulted in a conviction applies only to general impeachment with prior convictions, not bias cross-examination. *See* D.C.Code § 14–305(b) (2001); *Sherer*, 470 A.2d at 738.

30. Appellant was charged as the principal in the shooting, and the government argued in

to impeaching the credibility of Cooley–Hinton's trial testimony because his report showed that she had described a very different murder—by a lone gunman ("L") who was not appellant and that involved no drive–by shooting at all—when she first reported what she saw to Detective Brown. At trial, however, Detective Brown disavowed his own report and substantially vouched for Cooley–Hinton's changed story. Impeaching Detective Brown, therefore, became critical. Defense counsel's attempt to raise doubts about Detective Brown's credibility by questioning him and presenting evidence about the pending investigation into his corrupt behavior in the Club U investigation was frustrated, however, by the trial court's improper limitations on cross-examination. This impeachment would have "lessened the jurors' trust in [Detective Brown's] testimony," *Bennett,* 797 A.2d at 1257, and raised questions about his statement that Cooley–Hinton had not changed her story when she testified at appellant's trial that the gunman fired the shots from a truck.

We recognize that the defense strategy of impeaching Cooley–Hinton's trial testimony by having Detective Brown testify about her inconsistent statement to the police was partly successful. According to Detective Brown's report, Cooley–Hinton said "L" was the shooter, and at trial she denied that she had done so. Detective Brown did not retract that part of his report as a "typographical error." However, even though it might seem, at first blush, that the discrepancy between Coo-

ley–Hinton's statement to the police and her trial testimony about whether the shooter "walked up" or "drove up" was less important than her accusation that "L" was the shooter, the difference was critical in the context of the evidence inculpating appellant. At trial, Cooley–Hinton testified that appellant was driving the truck from which the shots were fired. Although she said it was the passenger, not the driver, who fired the shots, appellant would nonetheless have been guilty of aiding and abetting the murder; whether she said the shooter was "L" or not was not determinative of appellant's guilt. But if the shooter had "walked up"—as Detective Brown's report said Cooley–Hinton initially claimed—there would not have been a drive-by shooting from appellant's blue truck. Cooley–Hinton's changed account to a drive-by shooting was the scenario that the government presented at trial. That appellant's blue truck was involved in the shooting and that appellant was the driver were essential, therefore, to inculpate appellant in the murder, whether as a principal because he was the lone occupant (as Scott said and the government argued), or as an aider and abettor (as Cooley–Hinton's trial version supported). Several witnesses had also mentioned a truck at the scene of the shooting. Scott's companion Lewis said they heard a truck pull off after the shots rang out; but Lewis could not see the shooting (and said Scott could not either). Brickhouse, the neighbor who looked out the window after she heard the shots, testified to a more detailed sequence of events: that "L" had

closing and rebuttal that appellant shot Maurice Brown. (The government argued that Cooley–Hinton's testimony that there had been a passenger in appellant's car who fired the shots, added to her credibility because if she had a motive to lie, she would have said "I also saw [appellant] shoot" instead of saying she "didn't see who shot."). However, the court gave an aiding and abetting instruc-

tion to the jury based on Cooley–Hinton's testimony that a passenger fired the gun. The judge instructed the jury that appellant could be found guilty as an aider and abettor of murder and PFCV, but not of CPWL, as there was no evidence that the passenger in the truck was not licensed to carry a firearm. Appellant was acquitted of CPWL.

driven to Foote Street where Maurice Brown was lying, walked up to the body, and asked her to call the police; a few minutes later, Brickhouse saw appellant walking down the street and speaking to "L"; appellant then headed towards his truck, and returned to pick up "L." These witnesses made clear that appellant was not "L." Thus, the tapestry of testimony on which the government's case against appellant depended to paint a coherent picture would collapse if a single shooter— "L"—had simply "walked up" and fled on foot and appellant and his blue truck were not involved in a drive-by shooting. Cooley–Hinton's denial at trial that the shooter had walked up (backed by Detective Brown) was what held it all together.

We recognize also that defense counsel attempted to impeach Cooley–Hinton directly by questioning her about her motive to alter her story. Cooley–Hinton, a witness shown to be looking for favors from government officials, said that she gave information regarding Maurice Brown's murder when she was arrested and interviewed at the MPD Sixth District police station by Detective Brown on June 6, 2003, see note 4, *supra*, and then by Detec-

tives Blackwell and Middleton on June 18, 2003, in Rappahannock Regional Jail, while she was serving a sentence for cocaine charges. At the time of appellant's trial, Cooley–Hinton was waiting to be sentenced in two cases in the District for soliciting for purposes of prostitution and for possession of cocaine. In fact, Cooley–Hinton had spoken to the prosecutor in appellant's trial about her pending cases in order to seek his assistance.[31] In addition to seeking relief in her own pending criminal cases,[32] Cooley–Hinton testified, she had known the prosecutor in appellant's case since 1986 because he had prosecuted her brother for a "kingpin murder" "in relation to drugs." Her brother was still serving his sentence at the time of appellant's trial. Cooley–Hinton had contacted the prosecutor several times in the past for his assistance in getting her brother out of jail. Under the circumstances, a jury could well be persuaded that Cooley–Hinton was likely to change her story in important respects if she thought it might help her or her brother. That likelihood increased if the jurors knew that her first report to the police exculpating appellant had been made to an officer who was

31. She testified that she "asked him would he take and see that my first case that was dismissed and dropped stay that way and with the case that I'm on now, it was supposed to be over in February, why is it still continued, can he find out what's the problem and he said he would see, I mean he would find out.... I don't want to do a day."

32. It is worth noting that Cooley–Hinton's cooperation in appellant's case did, in fact, serve to reduce the sentence in one of her own criminal cases that was pending at the time of appellant's trial. At Cooley–Hinton's sentencing hearing before Judge Ann O'Regan Keary on May 9, 2005, three months after appellant's trial, Cooley–Hinton's counsel informed the trial judge that Cooley–Hinton had:

> testified for the Government in a homicide case ... The [homicide case] prosecutor

actually came to the last hearing earlier last week and told the [p]rosecutor [in Cooley–Hinton's case] ... that she not only helped in the conviction in that case, but helped in another matter also that someone was sitting in the courtroom and heard her testify and ended up pleading guilty. So, [the prosecutor] said it's a two[-fer], and that was one reason we were able to get the plea for the BRA [Bail Reform Act violation] in this, but plead to the sexual solicitation and dismiss the BRA.

Judge Keary took this information into consideration in sentencing Cooley–Hinton to 90 days imprisonment with credit for time served and a $50 fine to be paid to the VVCCA, stating, "in light of the further information that's been provided, the Court is willing to sentence Ms. Cooley[-Hinton] consistent with what the Defense has requested."

himself prone to shade testimony to conform to the evidence.

We have already explained the significance of Cooley–Hinton's testimony at the center of the government's case that Maurice Brown was killed in a drive-by shooting, and its apparent role in the jury verdict. The government's argument that appellant's motive was revenge because Maurice Brown had robbed him depended entirely on the credibility of Cooley–Hinton and of Scott. Scott was substantively impeached, by Lewis, concerning her ability to see the shooting at all, and, it appears from the verdict, her account that appellant was the shooter was not credited by the jury. The jury could, of course, have picked and chosen among the various parts of these witnesses' testimony, crediting some, disbelieving others. And with the right combination of credited testimony, the evidence would have sufficed to support the jury's verdict finding appellant guilty of second-degree murder. But sufficiency of the evidence is not the issue we need to consider.

"The correct inquiry is whether, assuming that the damaging potential of the cross-examination was fully realized, a reviewing court might nevertheless say that the error was harmless beyond a reasonable doubt." *Van Arsdall*, 475 U.S. at 684, 106 S.Ct. 1431. We cannot. If Detective Brown's biases had been fully exposed to the jury, his testimony recanting part of his police report and supporting Cooley–Hinton's testimony might have seemed suspect and, implicated in that suspicion, Cooley–Hinton's trial testimony about appellant's role in a drive-by shooting. Instead, as appellant argues, "the government benefitted from unfair bolstering of its claim that Ms. Cooley–Hinton was a truthful witness who had been consistent in her description of the crime." The jury was left to believe—especially after Detective Brown was rehabilitated by Detective

Blackwell—that Cooley–Hinton had never wavered from her account at trial that she had seen a drive-by shooting and that appellant had been the driver of the truck from which the shots were fired. Detective Brown's testimony that the inconsistent statement in his police report had been his own "typographical error," erased the doubt that the jury would likely have harbored about the credibility of a witness who could give two accounts that differed in such material respects. Detective Brown's testimony would have come under a cloud if the jury believed that just as he was capable of the witness tampering in the Club U case for which he was under investigation, he would be willing to lie under oath to the jury in this case in order to secure a conviction. However, defense counsel was not able to present a complete picture of the nature and extent of the biases that might have led Detective Brown to alter his testimony about what Cooley–Hinton told him about the murder of Maurice Brown. This impairment of the right of cross-examination was prejudicial, as the government's case against appellant for that murder was dependent on Cooley–Hinton, whose impeachment was thwarted by Detective Brown's testimony corroborating her testimony. That corroboration, as we have discussed, would have been subjected to serious impeachment had defense counsel been permitted the full scope of cross-examination and presentation of bias evidence to which appellant was entitled under the Sixth Amendment.

For the foregoing reasons, appellant's convictions are reversed and the case is remanded for a new trial.

*So ordered.*

FARRELL, Senior Judge, concurring in part and concurring in the result:

I agree that appellant's convictions must be reversed on the "corruption bias"

ground set forth in part III of the court's opinion. The trial judge's erroneous conclusion, urged by the prosecutor, that Brown's interaction with the witness or witnesses in the unrelated homicide case was essentially collateral denied appellant the chance to adduce extrinsic evidence potentially important to judging his veracity in this case when he rehabilitated a key government witness. The court persuasively explains why that is so, and no more is necessary to resolve this appeal. I cannot understand the court's insistence, nonetheless, on exploring issues of a possible due process violation under *Mooney/Napue* principles. Those issues are complex enough that ultimately the court itself does not decide the due process question, and even if it had done so, the conclusion would have no bearing on our decision to reverse.